## MORRIS FISHER v. RED & WHITE TAXI COMPANY AND ANOTHER.

133 N. W. (2d) 543.

February 19, 1965—No. 39,399.

*Paul D. Tierney,* for relator.
*McLeod & Gilmore,* for respondents.

FRANK T. GALLAGHER, C.

Certiorari to review a decision of the Industrial Commission. On May 24, 1962, employee-relator, Morris Fisher, filed a claim under the Workmen's Compensation Act against his employer, Red & White Taxi Company, for benefits in connection with a back difficulty. After a hearing in March 1963, the referee denied benefits and his decision was affirmed by the commission.

Relator contends that the referee erred in finding that the facts proved did not constitute a "personal injury" and that the employer had no notice and knowledge of the "personal injury" within the time provided by law; and that the Industrial Commission erred in adopting the determination and findings of the referee.

Briefly stated, the "injury" or "incident" for which the relator claims he should be compensated is an injury to the back which he claims was caused by the rotation and twisting of his spine while entering and alighting from the cab and by other functions that he performed as a cab driver.

Relator began his employment with the Red & White Taxi Company in 1952 as a cab driver and continued working for them in that capacity until September 23, 1961. Immediately prior to the time he terminated his employment, he was earning $75 per week, working the shift from 5:30 p. m. to 3:30 a. m.

On February 11, 1960, in a previous and unrelated accident, relator, while driving a cab, was hit by another car from the rear. He suffered a neck injury, causing pain in the arm, neck, elbow, and shoulder blade areas. He did not suffer any pain in the lower back area at that time. As a result of that accident, a settlement was made by which the relator was paid for 7 weeks of temporary total disability of an intermittent character and was paid 52½ weeks for a 15-percent permanent disability of the back.[1] Relator testified that a full and complete settlement of his workmen's compensation claim for that injury had been made. He was then asked:

"Q. At the time of that first accident did you have any injury in your low back?

"A. No, never complained of any, never had any.

"Q. Did you receive any treatment for anything to your low back?

"A. No, none whatsoever."

Relator also testified that in April 1960 he returned to work. On

---

[1]Subsequent to that settlement relator had instituted proceedings against the third party and had received a settlement of $7,750, from which attorney's fees of one-third were deducted and costs in the sum of $79.55.

September 11, 1961, he began to suffer a pain in his lower back. The pain continued and increased until September 23, when the pain became so intense that he was forced to quit. At 10 p. m. on that date he drove his cab into the taxicab garage and told the dispatcher, "I have to pull in, Miss Norgren, my back is just aching and killing me, I can't take it, can't sit in the cab, I'm so sore." There was no trauma or violent force that caused this injury. On September 18 he had seen Dr. Carter W. Howell, who had given him some treatment. He saw the doctor again after he was forced to quit work. At that time the doctor told him to go to Eitel Hospital. A few days afterwards he did so and an X ray was taken. On October 4 relator was admitted to the Veterans Administration Hospital. On October 12 a hemilaminectomy was performed on a herniated disc at the L4-L5 interspace on the right. Relator testified that he was unable to sit in an automobile until June or July 1962, and that up to the date of the hearing he had not driven an automobile.

Dr. Howell, relator's witness and the only physician who testified at the trial, gave a medical history of the complaints of the relator. The substance of this history was that he had seen relator on September 18, 1961, when the latter complained of low back pain and said that he had injured his back about a week before and that the pain had not subsided. Examination of the lower back area revealed that relator had muscle spasm and tenderness and some limitation of motion. Dr. Howell saw relator again on September 21 and he still complained of some back pain. A few days later relator phoned the doctor and stated that the pain was much worse and that he could not return to work because of it. Dr. Howell said that he had advised him to go to Eitel Hospital but that he did not see him personally that day nor did he treat him. He also said that he saw him for the last time on January 31, 1963, at which time he took a medical history and gave the patient a physical examination. The history disclosed that relator was admitted to Veterans Administration Hospital October 4, 1961, and 8 days later he had the hemilaminectomy. From the notes obtained from the hospital, the patient had a disc removed. He was discharged from the hospital on October 24. He told Dr. Howell that

he had not returned to work as a cab driver because of the residual pain in his back. The physical examination, according to the doctor, revealed that there was no muscle spasm and no limitation of motion in his neck, but there was some tenderness on the right side of his neck. The examination of his back at that time revealed a healed scar in the midline of the lumbosacral region. There was a minimal amount of muscle spasm present on both sides. Rotation of the trunk was normal and the reflexes of the lower extremities active and equal, with no evidence of any atrophy in the muscles of the thigh or calf. No sensory changes were noted in the lower extremities.

On the basis of the residuals of the disc surgery and objective findings, the doctor felt that relator had a permanent partial disability of his back of 20 percent. He further testified that between February 12, 1960, and September 5, 1961, there was no complaint, nor was any treatment given relator for low back pain or injury. He also said that the low back pain for which he examined him on September 18, 1961, was a new injury and not related to the accident of February 1960. In a hypothetical question the doctor was asked to assume all of the history he had obtained from relator, including the low back pain which the patient first experienced on September 11, 1961, and which became so severe that he had to stop driving his taxi on September 23 and eventually have surgery performed on his back at Veterans Administration Hospital, and based on his examination of January 31, 1963, "would you have an opinion as to whether or not the disability and injury that Mr. Fisher now has was as a result of the incident that occurred on September 11th, 1961?" After some discussion between counsel and the referee as to what incident they were referring to, the doctor answered that in his opinion the "residual difficulty that Mr. Fisher has is as a result of the incident, whatever it was, that occurred in September of * * * 1961."

On cross-examination the doctor said that on September 18, 1961, relator told him that he began to develop a low back pain about a week before; that it occurred as he was driving his cab; and that it gradually got worse and went down his leg. The witness was asked if that wasn't a typical "picture" in degeneration of discs where the

patient goes on and in the ordinary course of his employment the disc continues to degenerate until it finally ruptures. He replied, "It could be." He also said that it was well recognized in medical fields that a degenerative disc may prolapse at any time without any trauma.

On redirect examination the doctor testified that if a person had a condition where he could develop a disc because of degeneration, the fact that he was sitting driving a taxicab for long periods of time, as well as getting in and out of the cab, could cause the final disc rupture. He was then asked:

"Q.   And, Doctor, do you have an opinion as to whether or not that is what occurred in this case?

"A.   My opinion is that this is what produced the disc, yes."

The referee found that relator did not sustain personal injury arising out of and in the course of his employment on September 11, 1961, or at any other material time; that the employer had statutory notice and knowledge of relator's back condition, but not within the time provided by law. He denied relator's petition and in his memorandum stated that the employee at no time gave a history of personal injury to his doctors or to the Veterans Administration Hospital; also, that relator's testimony set up no particular history of personal injury and that he disclaimed any low back symptoms or difficulties prior to September 1961. The Industrial Commission affirmed the findings and determination of the referee.

Relator contends in substance that his back injury was related to his work, namely, that he suffered a personal injury arising out of and in the course of his employment. Employer and its insurer claim that his disability did not constitute any personal injury which arose out of and in the course of his employment.

The only witnesses at the hearing before the referee were relator and Dr. Howell. We cannot determine from relator's testimony that he sets out any specific event which he claims was the cause of his condition. He did not testify as to any circumstances of trauma or injury related to driving his cab on September 11, 1961, when he first experienced pain in his lower back. He said that he had no injury to his lower back when he suffered his neck injury on February 11,

1960; also, that he sustained no injury on September 11, 1961. He did say that on that day he felt a lot of pain in his lower back which got worse as he went along "as I was driving, in and out of the cab," and that that was the first time he experienced any pain in his lower back.

Thus, we have relator's own admission that the first time he had any lower back pain was September 11, 1961, but he was not injured on that day. However, in contending that his ruptured disc condition was related to his work with Red & White Taxi Company, relator relies upon the testimony of Dr. Howell. The doctor said that relator's residual difficulty was a result of the "incident" that occurred September 11, 1961; also, that if a person had a condition where he could develop a disc because of degeneration, the fact that he was sitting driving a taxi for long periods of time and had to get in and out of the cab could be the cause of a final disc rupture, and that this is what produced the disc in this case. He also testified, however, that the situation in the instant case could be a typical picture of the degeneration of discs and admitted that it is well recognized in medical circles that a degenerative disc may prolapse at any time with or without any trauma. Thus, we have a conflict in the testimony of the only doctor involved. The commission concluded that there was a lack of testimony of weight that relator's employment caused the ultimate disc rupture any more than his daily living would cause it. Minn. St. 176.011, subd. 16, defines "personal injury" as an "injury arising out of and in the course of employment and includes personal injury caused by occupational disease; * * *."

Relator cites Gillette v. Harold, Inc. 257 Minn. 313, 101 N. W. (2d) 200, as controlling. The question before the court in that case was whether a disability resulting from aggravation of a preexisting physical infirmity was compensable as a personal injury when the preexisting physical infirmity was not causally connected with the employment but the aggravation of the infirmity was. The employee in that case had worked for more than 17 years as a saleslady in a ladies' ready-to-wear store. She worked a 40-hour week and was required to be on her feet standing and walking most of the time. At the time of the litigation, she was 53 years old, weighed approximately 118 pounds,

and was about 5 feet 3 inches in height. It appeared from the record that she became aware of a painful condition in her left foot in January 1952 as a result of a chip fracture of the "lateral cuboid bone" of her left foot. There was also reference in the record to a gout condition from which she suffered at that time. The latter condition apparently cleared up and there was medical testimony to the effect that it had no relation to the condition of her foot which was found to be disabling. She continued work until May 1957, when she was informed by an orthopedic surgeon that she had a permanent disorder in her left great toe that could be helped by surgery. There was no evidence that this condition was in any way caused by her employment. About 2 months after surgery, she returned to work. There was medical testimony that at the time of the trial the head of the metatarsal bone and the phalange of the great toe had come together again, causing a stiffening accompanied by pain; that she would have to quit work or have the joint stiffened; that she sustained a 35-percent disability of the foot; and that if she continued in her work, the additional surgery would be necessary.

It appeared from the record there that while the underlying condition from which the employee suffered was an identifiable infirmity, the origin and cause of it was unknown. The medical testimony was to the effect that the deteriorative condition progresses slowly over a period of time and "the patient doesn't come to the doctor until it hurts." There was also medical testimony on both sides that the continual use of the foot in bearing the weight of the employee aggravated the condition resulting from the underlying cause, and that such aggravation of the underlying cause was disabling. We said in that case (257 Minn. 315, 101 N. W. [2d] 203):

"That the disability results from the continued use of the foot in walking or standing is established by the undoubted evidence that the employee's toe became stiff and painful particularly toward the end of the workday."

On the basis of the evidence submitted, the referee found that the condition of the employee's left foot was aggravated by a personal injury which arose out of and in the course of her employment. He

awarded her compensation, which award was upheld by the Industrial Commission, and its decision was affirmed by this court.

We said in the Gillette case that the term "personal injury" is not limited to a single definite act but may extend over a continuous period of time, citing Smith's Case, 307 Mass. 516, 30. N. E. (2d) 536; also, that the term does not "exclude an injury causally connected with the employment merely because the injury was not occasioned by physical impact or the application of some form of external violence to the body," citing Charon's Case, 321 Mass. 694, 696, 75 N. E. (2d) 511, 512. It was stated in Pittman v. Pillsbury Flour Mills, Inc. 234 Minn. 517, 524, 48 N. W. (2d) 735, 739: "An injury is compensable whether it causes a disease or merely aggravates an existing infirmity." In Brzozowski's Case, 328 Mass. 113, 114, 102 N. E. (2d) 399, the court said that an "aggravation and acceleration constitutes a personal injury within the meaning of the workmen's compensation act" in that state. In the Gillette case this court also said (257 Minn. 321, 101 N. W. [2d] 206):

"It is well established by the authorities that when the inevitable effects of an underlying condition are hastened by an injury that is sudden and violent or the result of unusual strain or exertion, the injury and its disabling consequences are compensable. It should further be conceded, however, that injuries may arise out of and in the course of the employment which do not occur suddenly or violently. In the course of one's ordinary duties injuries may occur daily which cause minimal damage, the cumulative effect of which in the course of time may be as injurious as a single traumatic occurrence which is completely disabling. We have been presented with no good reason why compensation should be paid in one instance and not in the other."

The commission in its opinion in the instant case agreed that the Gillette case asserted a sound, accepted theory of the law which was applied to the positive set of facts in that case, but distinguished that case from the instant case in that there the effects of the occupation were factually and medically certain and that the evidence of her extensive walking left no doubt as to the probability of her occupation being the material aggravation of her preexisting defect and the cause

of her disability. The commission went on to say, however, that it was neither the intention nor the effect of the Gillette case to hold compensable those cases where the only reasonable probable relationship of the employee's condition to his employment was that he became cognizant of his condition while working or that at that time the employee's diseased condition progressed naturally into disability. In the case before us, although the testifying doctor was of the opinion that relator's activities in connection with driving a cab were what produced the disc, he also recognized that relator's condition could be a typical picture of a degenerative disc and that such a disc may prolapse at any time.

It is our opinion that the evidentiary differences between Gillette and this case were fact questions for the commission and that it was within its authority, under the evidence here, in concluding that there was a lack of evidence of weight that relator's employment or any more than his other daily living caused the ultimate rupture of his disc and resultant disability.

We have repeatedly held that the commission's determination of fact questions will not be disturbed on appeal unless it is manifestly contrary to the evidence. Schwerzler v. Frankamp, 255 Minn. 95, 95 N. W. (2d) 503; Torrey v. Midland Cooperatives, Inc. 253 Minn. 489, 93 N. W. (2d) 135. We cannot say that the record in this case does not contain support for the commission's decision. The duty of weighing the testimony and drawing the proper inferences therefrom was that of the commission. It is apparent that this was done and that the commission concluded that positive proof of causal connection was lacking. Under those circumstances, this court cannot substitute its judgment for that of the commission. Luthens v. Glencoe Red & White Store, 264 Minn. 26, 117 N. W. (2d) 386.

In view of our decision on the merits in this case, it is not necessary to determine whether the statutory notice was given.

Affirmed.