Kathleen M. HOLLIDAY, Respondent,

v.

RUSH PRODUCTS DIVISION OF LAKE CENTER INDUSTRIES et al., Relators.

No. 48627.

Supreme Court of Minnesota.

July 13, 1979.

Fitch & Johnson and Larry J. Peterson, Minneapolis, for relators.

Grose, Von Holtum, Von Holtum, Sieben & Schmidt and Timothy J. McCoy, Minneapolis, for respondent.

Heard before KELLY, WAHL, and STONE, JJ., and considered and decided by the court en banc.

KELLY, Justice.

This workers' compensation case was heard before the Workers' Compensation Division. The compensation judge found for the employee on all issues and the relators appealed. The Workers' Compensation Court of Appeals affirmed the decision, one judge dissenting. Relators then filed a petition for a writ of certiorari which was granted by this court. We affirm.

Employee Kathleen M. Holliday was born in England in 1916. After graduating from high school she painted pottery in a factory for 9 years and then, during the war, worked as an electrician for an aircraft factory for five and one-half years. After the war she worked at a variety of jobs while awaiting transportation to the United States. In the United States she was married and did not immediately go out to work. She did, however, work for a year in 1951 or 1952 doing cooking and waitress work, but she was not employed again until 1967.

In August of 1967 she began working for Rush Products doing repetitious light assembly work. She had a variety of medical problems, including diabetes and hyperten-

sion, which caused her to miss over 8 months' work during the period from 1971 thru 1972. Also during this time her doctors recommended that she lose weight,[1] and she had problems with her knees. Her work attendance record improved markedly in 1973 and 1974, however.

In April of 1975 her job involved putting together a wiring assembly for Buick windshield wipers. The job involved no heavy lifting, only reaching and turning and some pushing of the wires into sockets. However, her back began to trouble her while she had this job. On Thursday, April 10, 1975, Mrs. Holliday's lower back began to hurt her. The pain continued Friday, but it was not too bad on Monday when she worked at another type of job. Mid-morning Tuesday, April 15, she was returned to her original job. Shortly thereafter she felt "a little catch" low in her back and experienced much pain. After lunch she was unable to get up and was taken home. The next day Mrs. Holliday went to see a doctor. The pain continued, however, and she was admitted to a hospital from April 19 to April 23. She returned to work May 22 doing a light assembly job but again experienced much pain. She again saw a doctor and was admitted to a hospital on June 2 for a 2-week stay. She has not returned to work at Rush Products since that time.

In July of 1975, the Rush Products plant manager called Mrs. Holliday to ask her if she was going to return to work. He quoted her as replying: "I can never return. * * * I have to lie down from time to time throughout the day, and I don't feel I can ever do justice to my work again." In October of 1975 a nurse was sent to visit Mrs. Holliday by the compensation insurer. Mrs. Holliday told her: "I didn't think I could go back and do that again. I had already hurt myself twice, I didn't figure I should have to do it a third time."

On appeal, relators contend that respondent has not proven (1) that her disability was continuous and total after October 21,

1975, (2) that there will be a need for medical care and treatment in the future, or (3) that one of her doctor bills was for care by a treating physician.

■ 1. At oral argument counsel for the relators stated that Mrs. Holliday's job was "the type job that if anybody could do any job at all, they could do this job." Relators argue that she has not sustained her burden of proof on the claim for continuous and total disability since October 21, 1975. This is essentially a factual question to be resolved by the Workers' Compensation Court of Appeals.

"* * * Findings of fact made by the Workers' Compensation Court of Appeals must be viewed in a light most favorable to such findings. In accordance with this general rule, this court has repeatedly held that we will not disturb a decision of the compensation court on questions of fact unless a consideration of all evidence and inferences permissible therefrom clearly require reasonable minds to adopt a contrary conclusion. It is not our function as an appellate court * * * to determine whether its ultimate decision was preferable under the evidence, but rather to discern whether there was substantial credible evidence present in the record to support the award." *Briggs v. McKee, Inc.* Minn., 259 N.W.2d 266 (1977). (Citations omitted.)

There was evidence in the record that Mrs. Holliday had a stable work record prior to her employment at Rush Products. Although she had suffered from major medical problems during her employment at Rush Products, she had returned to work and had maintained a high work performance level. Her testimony indicated that her injury was related to the job she was doing. Nevertheless, Mrs. Holliday had tried to return to work but had left because of pain. Dr. Meyer Z. Goldner, who examined and treated her, stated at deposition that Mrs. Holliday continues to present

---

1. Her weight has varied between approximately 170 and 225 pounds during the past few years.

symptoms of a lumbar disc syndrome arising out of her work-related activities. He also stated that her condition was permanent and that while her weight did not do her condition any good, it did not make a difference, that both heavier and skinny people have the same complaints. As to her ability to work, Dr. Goldner remarked that he didn't think she could do anything except get around.

Relators' contention that Dr. Goldner's opinion was based on an inadequate description of the job involved is without merit. It is apparent from Dr. Goldner's testimony that he did not feel Mrs. Holliday could do any work on a sustained basis.[2] Prodded by counsel, he did state: "[I]f there is anything they could offer that she can do, let her try it." But Mrs. Holliday testified that her condition has remained about the same since she left Rush Products, and she is the best judge of what work she can and cannot do. *Brening v. Roto-Rooter, Inc.* 304 Minn. 562, 237 N.W.2d 383 (1975).

■ Substantial credible evidence exists in the record to support the decision below. Although Dr. Goldner's testimony is often in conflict with that of another physician who described Mrs. Holliday as being able to return to work, this is not a situation which clearly requires a conclusion contrary to that reached below.

Relators also argue that Mrs. Holliday has not returned to work due to her nervous condition. This condition, however, is partially the result of her injury and the uncertain state of her work situation. The facts of Mrs. Holliday's nervous condition and hesitancy to return to work were before the courts below and there is no indication that the facts were not considered in reaching their decisions.

Finally, relators argue that Mrs. Holliday has a degenerative disc disease which became symptomatic while on the job, that it was not a result of job-related activities, and thus she does not suffer from a personal injury which is compensable under the Workers' Compensation Act. Although such an injury would not be compensable under the act,[3] *Fisher v. Red & White Taxi Co.* 270 Minn. 317, 133 N.W.2d 543 (1965), the existence of such an injury is contrary to the factual findings of the courts below which were supported by substantial credible evidence.

■ 2. Relators argue that no evidence has been presented to indicate that there will be any need for medical care and treatment in the future. Dr. Goldner, however, stated in his deposition that he felt there would be such a need. Although Mrs. Holliday had received no medical treatment for her back from the time of her discharge from the hospital in June 1975, until her examination by Dr. Goldner, the prescription of the corset by Dr. Goldner constitutes medical treatment. Further, such a corset could require adjustment or replacement in the future. Also, Mrs. Holliday's pain increases with increased activities so that her condition is not stable. Additional treatment or care may be necessary to alleviate pain.

3. Relators argue that Dr. Goldner was not a treating physician and his bill of $240 should be disallowed from coverage. At the request of her lawyer, Mrs. Holliday went to see Dr. Goldner on September 10, 1976, just prior to the commencement of litigation. Dr. Goldner not only examined her but also prescribed a lumbo-sacral corset to give support to her lumbar spine region and to reduce some of her pain. At his deposition Dr. Goldner indicated that Mrs. Holli-

---

**2.** Dr. Goldner's description of her ability to work provided a reasonable basis for the decision below: "I don't think she can do anything except get around. I don't think she can do anything on a sustained basis. I don't think she can lift, she can't bend, she can't reach, she can't walk, she can't sit, she can't climb, she can't kneel, she can't squat. If you exclude all these things, I don't think that leaves very

much in the way of any type of gainful occupation."

**3.** An injury which is the result of the aggravation of a pre-existing physical infirmity is compensable under the act, however, if the aggravating circumstances are job related. *Gillette v. Harold, Inc.* 257 Minn. 313, 101 N.W.2d 200 (1960).

day was next examined by him on November 15, 1976. She reported to him on the use of the corset. On January 24, 1977, she had her last appointment with Dr. Goldner and again indicated that the corset was of help to her. At the Workers' Compensation hearing, Mrs. Holliday testified that she used the corset and that she thought it was some help to her. Dr. Goldner billed Mrs. Holliday $325, $85 of which was paid by her lawyer's office for reports.

There is evidence in the record to support the findings of the Compensation Judge and the Court of Appeals that Dr. Goldner was a treating physician. This finding is both reasonable and practical. If relators' argument is followed, it would result in an examining physician being only able to refer a patient to another doctor. As a result both bills would probably be higher because of the overlap of work involved in examining a patient.

Respondent is allowed $400 attorneys fees.

Affirmed.

SHERAN, C. J., took no part in the consideration or decision of this case.

OTIS, Justice (dissenting).

This is another of a series of cases where the majority of the Workers' Compensation Court of Appeals rejects the report of an attending physician and adopts the views of an expert, hired by the employee's lawyer for purposes of litigation, who first examined the employee a year and four months after she permanently left her job.

It is undisputed this employee's initial back problem was a degenerative narrowing of the disc space in the lower spine and she suffered from a combination of disabilities unrelated to her work. She was in 1975 58 years of age, 5-foot-3½ inches in height, and weighed approximately 200 pounds. She suffered from diabetes, hypertension, a nervous condition, and degenerative joint disease in the knees. The sum total of her testimony of trauma was that in April 1975 while sitting at a sedentary job, assembling electrical switch terminals for windshield wipers, she "thought [she] felt a little catch," in her low back while changing positions, and suffered severe pain which persisted for several days until she was hospitalized. She testified that throughout the several months on that particular assembly job she "did notice a little pain" intermittently which gradually worsened.

Dr. Stephen Haug, an orthopedist, attended Mrs. Holliday as a consultant in June and July 1975 and found she had "degenerative arthritis of the lower lumbosacral spine" and "essentially a chronic back strain" as a result. He found no evidence of any neurological impairment or disc problem other than the degenerative changes. While he agreed that prolonged sitting was bad for her back, he felt she was able to work and hopefully her employer could give her a different type of job. She was encouraged to lose weight, and to use Salicylates, and discharged from his care.

The doctor who examined Mrs. Holliday for the employer in May 1976 and March 1977 agreed that she had degenerative disc disease and found no evidence of a bulging or protruding disc which would be entirely different. He attributed the major problem in her disability to her weight.

Even the physician retained by her lawyer found no evidence of nerve root compression, agreed she had degenerative changes in the lower spine, and believed "her difficulties are mainly from a weakened and unstable and painful disc structure" which he termed a "protruded disc." Yet he is the only physician who testified that her "symptoms and findings of a lumbar disc syndrome" were related to the work she performed in April 1975. He admitted his opinion was based on a job description which omitted any evidence of the force, rapidity, spinal movement, body position, or weight of the objects which her job entailed, and that he assumed it "required the use of her arms in a repetitive manner at some time during an eight-hour day."

Although all of the doctors agree she could try to return to work, she has not since May 1975 sought any further employ-

ment, and continues to receive temporary total disability benefits indefinitely.

Judge Pomush in his dissent equated these facts with those in *Fisher v. Red & White Taxi Co.* 270 Minn. 317, 133 N.W.2d 543 (1965), where the compensation court had held that a ruptured disc experienced without trauma while pursuing sedentary employment as a cab driver was not proved to be caused by the employment any more than by daily living. The compensation court in the *Fisher* case distinguished *Gillette v. Harold, Inc.* 257 Minn. 313, 101 N.W.2d 200 (1960) on the ground that it involved more than a condition of the body which merely became symptomatic while the employee was working. I agree with the construction of Judge Pomush that there is nothing in the employee's history that can reasonably be said to constitute a personal injury which caused employee's present condition and justifies continuing temporary total disability benefits.

I adhere to the view that even in workers' compensation cases the employee has the burden of proving by a fair preponderance of the evidence that her employment caused a disability she would not otherwise have experienced; and that the compensation court has the duty of scrutinizing the evidence with a view to arriving at a detached judicial assessment of the credibility of witnesses.[1]

In my opinion we have an obligation to require the compensation court to adhere strictly to these principles as long as we continue to have the responsibility for reviewing their decisions. We are a court of last resort and to do otherwise than insist on a uniform application of these rules is to demean the whole judicial process.

I would reverse.

PETERSON, Justice. I join in the dissenting opinion of Mr. Justice Otis.

ROGOSHESKE, Justice. I join in the dissenting opinion of Mr. Justice Otis.

1. See, *Mansfield v. Gopher Aviation Co.,* 301 Minn. 36, 221 N.E.2d 135 (1974).