Barbara A. TALMAGE, Respondent,

v.

MEDTRONIC, INC., et al., Relators.

No. 81–265.

Supreme Court of Minnesota.

Feb. 5, 1982.

Joseph J. Grill, St. Paul, for relators.

Babcock, Locher, Neilson & Mannella and Robert F. Mannella, Anoka, for respondent.

PETERSON, Justice.

Relators, Medtronic, Inc. and its workers' compensation insurer, seek review of a decision of a divided Workers' Compensation Court of Appeals awarding employee compensation for continuing temporary total disability. Relators contend that several findings underlying the award are without adequate support in the evidence. Our review of the record leads us to the contrary conclusion.

Employee worked for several years in Medtronic's pacemaker-repair department. On October 28, 1976, she was installing a belt on the rollers of an upright sander when the machine accidentally started, causing the belt to slip off a roller and wrap tightly around employee's right hand. She jerked back immediately and the belt slipped off her hand before it could be drawn into the machine. She went immediately to the office of Betty Johnson, the company nurse, but was unable to see her then. By evening employee's hand was black and blue and swollen. The accident occurred on a Thursday, the last day of employee's 4-day work week. Employee returned to work the following Monday but had pain in her hand, wrist, and arm to the shoulder. She reported the incident to Ms. Johnson and asked if she should see a doctor. Ms. Johnson did not think that necessary but told employee that she probably had tendonitis and that her symptoms might persist for a time if she had pulled a muscle or tendon.

In the next several months employee continued to operate the sander some of the time and also performed other tasks required in the repair process, including buffing pacemakers and performing final cleaning. Employee continued to have pain, varying in intensity, in her hand, wrist and arm. She found sanding was the easiest task because she operated the sander with her left hand but she still would have a dull ache in her hand after performing this work. She found buffing and final cleaning considerably more difficult and after performing these tasks her hand and wrist would swell and she would develop intense pain in her hand, wrist and arm. Other employees testified that employee complained often about her injury. Employee felt that her supervisors did not believe she had a problem, but there was some evidence that they attempted to switch her about in an effort to find work which would not cause her pain. Employee also had difficulty turning and shifting her automobile and would attempt to use her left hand in household tasks. She did not miss work, which she considered her "top priority," but used aspirin and would lie down with a heating pad wrapped about her arm and hand as soon as she arrived home at night.

Employee reported her pain to Ms. Johnson at various times. In March 1977 the latter authorized employee to see Dr. Strait who diagnosed tendonitis, gave her an injection with cortisone, and advised her to avoid overuse of her hand for a few days. She stayed away from work for the prescribed period. Soon after her return she developed a constant ache in her hand and made an appointment to see Dr. Quam on April 5, 1977. He also diagnosed tendonitis and told employee to avoid lifting and strenuous activity in her work. After seeing her twice more, Dr. Quam referred employee to Dr. Marlen Strefling, an orthopedic surgeon who first saw employee on May 23, 1977.

Dr. Strefling found that employee had tenderness centered in the proximal joint of her index finger, but said diagnosis was difficult. He prescribed Indocin which proved beneficial. On August 1, 1977, em-

ployee told the doctor that her discomfort had increased when the prescription ran out and that some of her work had aggravated her hand. Dr. Strefling then wrote a note restricting employee from "sanding, filing and final cleaning." A month later, he noted mild swelling in the proximal joint of her index finger, suggested that she consider changing the type of work she did at least temporarily, and again repeated his restrictions on her work activities. Because her condition did not improve, on September 12, 1977, he placed her index finger in a splint and her hand and wrist in a short arm cast for a 2-week period, during which she could not work. At the end of that time employee had no tenderness in her finger and thumb. Dr. Strefling told employee that she could work again but if possible to avoid activities which would aggravate her hand. By early October, however, employee returned to Dr. Strefling, complaining again of tenderness in the same joint of her index finger. About this time Medtronic gave her a different position in which she folded data cards. She found that this activity also caused pain in her hand and wrist.

On her return to Dr. Strefling, he referred her to a colleague, Dr. Arnold Hamel, a board-certified orthopedist with a subspecialty in hand surgery. After examination Dr. Hamel felt that employee had a pain syndrome caused by an overuse of the muscles of her arm and possibly some tendonitis or synovitis in her hand, wrist and forearm. He saw her again on November 22, 1977, and then advised her to take a full month off for a longer period of rest. At this point Medtronic terminated her employment. During the 2 weeks in which employee had a cast on her arm, relators had paid her temporary total disability compensation, and they resumed payment of such compensation when Dr. Hamel advised that she take a leave of absence.

Relators discontinued payments of those benefits on October 20, 1978, on the ground that there were jobs available which employee could do but she was not actively seeking employment. She then filed a claim petition seeking an award for continuing temporary total and an unknown amount of permanent partial disability of the right hand or right arm.[1]

Employee testified at the claim hearing that in early 1979 at Dr. Hamel's direction she underwent physical therapy which in her opinion had an adverse effect on her condition. Dr. Hamel testified that when he last saw employee on March 28, 1979, he noted slight tenderness in the muscles of her forearm but could find nothing wrong with her hand. She did not seek medical attention for several months after that visit to Dr. Hamel because she thought that it was doing no good. In August 1979 she consulted Dr. Joseph Engel, a board-certified specialist in rehabilitation medicine, and complained of pain in her wrist, arm and shoulder and of pain in the right side of her neck.[2] He prescribed a transneural stimulator in September 1979 which employee found reduced her pain considerably. At the time of the hearing in February 1980, however, employee testified that her hand aches and swells when she does anything more than "real light work."

Dr. Engel found on examination that employee had a normal range of motion and no atrophy in her right hand, but observed swelling on the back of that hand and found that employee had considerably less strength in her right hand and fingers than in her left. He expressed the opinion that there was a causal relation between these findings and the work incident of October 1976; that employee has sustained a 15% permanent partial disability of her right hand and wrist and that this disability limits use of the hand in a normal manner and causes pain when employee grasps and han-

1. Permanent partial disability was not determined in the subsequent proceeding and is not in issue here.

2. Employee had a congenital condition in her neck prior to October 28, 1976, which Dr. Engel thought was aggravated by the work incident and her subsequent work. The Court of Appeals and the compensation judge agreed that her neck condition is not work-related and the employee did not challenge that finding.

dles heavier materials; and that she would continue to need the neural stimulator. Dr. Hamel ascribed employee's symptoms in her right hand, wrist, arm and shoulder to an overuse or pain syndrome, which he said resulted from overuse following the initial injury, and also to emotional strain due to hostility to her employer. This witness had not obtained objective findings in his examinations of employee, but agreed that swelling (noted by Dr. Strefling, by a physical therapist treating employee in March 1979, by Dr. Engel in August 1978, and by other employees and members of employee's family at various times) was an objective symptom. Dr. Hamel felt that his diagnosis of overuse was substantiated by employee's improvement when she had taken time from her work activities.

Dr. Arnulf Svendsen, also a board-certified orthopedic surgeon, who examined employee adversely in February and March 1980, found no objective findings concerning limitation of motion, joint abnormality, muscle atrophy or weakness, or swelling. He expressed the opinion that employee had no need for treatment, had sustained no permanent partial disability, and was capable of gainful employment in work like her work for Medtronic. Based on her subjective complaints, however, he felt that she should not undertake work requiring strenuous overhead use of her arms or repetitive, forceful use of her right arm.

With respect to employee's efforts to obtain other employment, she testified that she had applied unsuccessfully for work with a large number of employers. She introduced a list of these employers into evidence. Between May 1978 and January 1, 1979, employee also received leads and advice concerning how to obtain employment from Kevin Karr, a private rehabilitation counselor to whom she was referred by relators. She also underwent evaluation at the Kenny Rehabilitation Center in the summer of 1978, by CETA at some point, and at the St. Paul Rehabilitation Center in the summer of 1979. She also registered with the State Employment Service. Through Karr's assistance employee was offered one job which required her to use tweezers. She refused it because she said that the aching in her fingers and wrist prevented her from doing such work.

Karr testified that he found good opportunities for jobs which in his opinion were suitable for employee, but that she "kept coming up with excuses" (family problems, illness and lack of gasoline to go on job interviews) for not looking for work. He also said that she refused to consider a job requiring her to work a second or third shift, refused to work in downtown Minneapolis or anywhere more than 10 miles from her home, and refused to work for less than $5 an hour. He knew, however, that employee was limiting her work hours to those during which her daughter was in school to avoid leaving the child without supervision, and a job opportunity which he described in downtown Minneapolis required her to work the second or third shift. Employee denied having stated that she would not work for less than $5 an hour and said that there was no reason to do so because she knew she could receive workers' compensation to make up for wage loss if her earnings were less than they had been with Medtronic.

On this evidence the compensation judge found that employee sustained injury to her right wrist in the sander incident on October 28, 1976, but sustained no further injury as the consequence of her work thereafter, and that she was not totally disabled following October 20, 1978, when relators discontinued payment of temporary total disability compensation. On appeal, two members of the Court of Appeals agreed, but the majority, setting aside the compensation judge's findings and determination, awarded employee continuing temporary total disability compensation pursuant to findings that she had sustained injury to her right hand and arm on October 28, 1976; that her continued work from that time until September 12, 1977, caused an aggravation of the injuries previously sustained; and that she was still temporarily totally disabled following relators' discontinuance of compensation payments to the date of the compensation hearing on Febru-

ary 12, 1980, at which time her disability was still continuing.

 In this court relators challenge all of these findings although they are aware that our scope of review of factual determinations of the Court of Appeals is extremely limited. We have repeatedly stated that we view the facts in the light most favorable to the findings and that such findings will not be disturbed unless consideration of the evidence and inferences permissible therefrom requires reasonable minds to adopt a contrary conclusion. *Findorff v. Pinkerton's, Inc.*, 295 N.W.2d 373 (Minn. 1980); *Holliday v. Rush Products Division*, 284 N.W.2d 538 (Minn.1979).

Applying this rule, we are required to affirm the decision under review in spite of the fact that the evidence might also have permitted findings to the contrary.

 Turning to the specific issues raised by relators, they contend first that there is insufficient evidence that employee sustained an injury by reason of her work between October 28, 1976, and September 12, 1977. In our view the finding has substantial support in the evidence and the inferences permissible therefrom. Shortly after the accident of October 28, 1976, the company nurse told employee that she probably had tendonitis which might take some time to disappear. Employee returned to work immediately, however, and her work required constant repetitious movements of her right arm and hand. She testified that working with the sander all day resulted in a dull ache in her hand and occasional swelling in her wrist and that working at other tasks, particularly the buffer, caused a toothache-like pain in her hand and "clear up to her neck" and swelling in her wrist. There is ample evidence that she complained of her inability to perform the tasks, but she nevertheless attempted to perform them. Dr. Hamel's diagnosis that employee had "an overuse syndrome or a pain syndrome generally caused by an overuse of the muscles of the upper extremity and possibly some degree of tendonitis or synovitis in the hand and wrist and forearm area" also furnishes support for the finding.

Relators, although initially admitting that employee sustained a work-related injury in the sander incident, contend that there was no evidentiary support for the finding that this injury involved her arm as well as her hand. They base their argument on Ms. Johnson's records of employee's complaints related to difficulties with the proximal joint of her index finger and with her hand. Employee testified, however, that by the time she saw the nurse on November 3, 1976, she had pain in her hand, wrist, and "clear to my shoulder." Both employee and her daughter testified that employee would come home from work and wrap her entire arm in a heating pad and that she often used liniment from her shoulder to her hand. Dr. Hamel's finding that employee had tenderness in the muscles of her forearm and his diagnosis of overuse of the muscles of the arm also support the finding. The nature of the accident itself, in which employee jerked back forcefully in an attempt to avoid having her hand caught in the sander, also seems consistent with an injury to her arm as well as her hand.

Finally, relators contend that the finding of continuing temporary total disability after their discontinuance of compensation payments was without evidentiary support. They point to the evaluations of employee's work tolerance, which concluded that she was capable of light levels of work with her right hand except for work requiring repetitive motions of her right wrist, and they rely also on Dr. Svendsen's opinion that she could return to the kind of work she had been doing. This evidence, however, is countered by Dr. Hamel's and Dr. Engel's opinions concerning employee's work restrictions and her testimony that anything more than "real light work" causes her hand and wrist to swell and ache. In *Brening v. Roto-Press, Inc.*, 306 Minn. 562, 237 N.W.2d 383 (1975), we recognized that an injured employee is the person most familiar with the severity of his or her symptoms and the limitations the disability places upon his or her physical activities. Although participation in the pain clinic may help employee ultimately, if her testimony

is credited, the present limitation of very light work would seem to restrict openings in factory work, to which her work experience has been largely limited.[3]

■ Relators contend, finally, that employee has withdrawn from the labor market. They stress Karr's testimony that employee refused to work for less than $5 an hour, refused to work in downtown Minneapolis and refused to work a second or third shift. They contend that such restrictions, together with an alleged lack of persistence in pursuing job opportunities and employee's rejection of one job offer, require the conclusion that she has in fact withdrawn from the labor market. Karr admitted, however, that employee actually received only one job offer, and her refusal was based on her inability to handle tweezers. Her explanation for feeling that she could work only the first shift because of her daughter's need for supervision (presumably no longer a consideration because at the time of the compensation hearing her daughter was living with her grandparents) was not unreasonable, and employee denied that she had refused to work for less than $5. Also, employee testified that she wants to work and submitted evidence of her unsuccessful attempts to obtain a job within her physical limitations. Her testimony, credited by the trier of fact, furnishes substantial support for the finding of continuing temporary total disability.

Employee is awarded attorneys fees of $400.

Affirmed.

KELLEY, J., took no part in the consideration or decision of this case.

OTIS, Justice (dissenting).

As the majority opinion correctly points out, this employee did indeed impose a list of restrictions on any job that she would accept. She refused to work in downtown Minneapolis; she refused to work further than 10 miles from home; she refused to work with a microscope; and she would work only on the day shift. The vocational counselor testified that it was a "frustrating experience" working with the employee because she kept coming up with excuses for not interviewing for or accepting jobs. Under these circumstances I would hold that the employee effectively withdrew herself from the labor market and that she was not totally disabled. *See Saenger v. Liberty Carton Co.*, 281 N.W.2d 693 (Minn.1979).

In addition, the medical testimony does not in my opinion support the extent of the injury Respondent claims. She alleges that injury to her hand causes pain which can be felt in her neck. The expert testimony of several doctors, however, reveals no objective sign of disability. As of March 1980, Dr. Svendsen could not account for the employee's complaints. He could find nothing wrong with her hand and there were no objective signs of limited mobility in the employee's wrist or neck. As of March 1979, Dr. Hamel's reports reveal that he was unable to explain the cause of the employee's wrist problems. Unless she was suffering from symptoms which linger after the injury has healed, the weight of the expert medical testimony reveals "physical facts which speak the truth unerringly." *Turay v. Allied Enterprises, Inc.*, 256 N.W.2d 71, 74 (Minn.1977). The testimony of the employee about her continuing injury was largely discredited.

---

**3.** We are entirely unconvinced by the thesis, advanced in the dissenting opinion, that the employee's testimony should be discredited because the weight of the conflicting medical testimony allegedly reveals "physical facts which speak the truth unerringly" concerning the extent and effect of employee's injuries. Such "physical facts" in *Turay v. Allied Enterprises, Inc.*, 256 N.W.2d 71 (Minn.1977) were X-rays which identified beyond doubt which knee an employee had injured in a work-related acci-

dent; we held the X-rays to be medical evidence which controlled decision there. In our view, conflicting medical opinions cannot rationally be viewed as deserving of the certainty accorded X-rays. Instead, we believe the applicable principle of law in this case is the familiar rule that resolution of conflicts in the opinions of medical experts is the function of the Court of Appeals as the trier of fact. *Gaspers v. Minneapolis Elec. Steel Castings Co.*, 290 N.W.2d 743 (Minn.1979).

The employee did not make a sincere effort to return to work which she could reasonably be expected to do and rejected job opportunities which were suited to her physical limitations. Accordingly, in my opinion, the compensation judge's termination of weekly benefits was proper and the decision of the majority of the court of appeals should be reversed.