James FLOWERS, Respondent,

v.

CONSOLIDATED CONTAINER CORP., Employer,

Home Insurance Co., Respondent,

Travelers Insurance Co., Respondent,

Employers Insurance of Wausau, Respondent,

Fireman's Fund American Insurance Co., Relator,

Blue Cross and Blue Shield of Minnesota, Hennepin County Welfare Department, Intervenors,

and

State Treasurer, Custodian of the Special Compensation Fund, Respondent.

No. C9-82-1037.

Supreme Court of Minnesota.

July 15, 1983.

Cragg & Bailly, Gary J. Gordon and Dan K. Prochnow, Minneapolis, for relator.

Cloutier & Musech and Cortlen Cloutier, Minneapolis, for Flowers.

David K. Wendel and Patrick Farnand, Minneapolis, for Employer and Home Ins. Co.

Alex B. Leibel and John G. Ness, Minneapolis, for Employer and Travelers Ins. Co.

Cousineau, McGuire, Shaughnessy & Anderson and Thomas P. Kieselbach, Minneapolis, for Employer and Employers Ins. of Wausau.

AMDAHL, Chief Justice.

This is a workers' compensation action brought by James Flowers, a laborer employed by Consolidated Container Corporation (Consolidated) from 1971 to 1978. A compensation judge awarded Flowers permanent partial disability benefits for two injuries: 25% disablement of his lungs and 10% disablement of his back. Flowers was also found to be temporarily totally disabled from February 23, 1978, until November 19, 1981, and continuing. The insurer on the risk for the last 3 months of Flowers' employment, Fireman's Fund American Insurance Co., was found liable for all benefits and expenses and its claims for apportionment, contribution, and reimbursement were denied. Claims for reimbursement brought by intervenors Blue Cross and Blue Shield and Hennepin County were dismissed due to a failure of those parties to appear at the hearing. The Workers' Compensation Court of Appeals affirmed the compensation judge's findings and conclusions in all respects. We also affirm.

James Flowers, employee-respondent, is 52 years old, presently married, and the father of 12 children. He has never received any formal education and is unable to read or write. In 1971 Flowers began working for Consolidated whose business is reconditioning used metal barrels or drums. Flowers' first assignment was unloading, stacking, and counting barrels outside for a period of 3 weeks; most were 55-gallon barrels weighing from 35 to 50 pounds. He was then assigned to an outdoor furnace, placing barrels upside down on a conveyor belt which carried the barrels into the furnace, where any residue in the barrels was burned out at a temperature of 1000° F. He stood within 1 or 2 feet of the furnace door, and in front of a vat located under the conveyor to catch any residue that fell from the overturned barrels. Though he could not read the labels, Flowers understood this residue included such chemicals as paint, paint thinner, granular insecticides, DDT, axle grease, shortening, cooking oil, and cheese. Occasionally the chemicals in this vat caught fire and produced choking smoke and fumes. Smoke also emanated from the furnace continually and blowers were ineffective to keep the air clear. He left this furnace job in October of 1974 when he broke his ankle in an unrelated incident at home. After recuperating, he stacked barrels again for 3–4 months and in April 1975 began work in the "cutting room," where he cut tops off barrels to prepare them for the furnace. The fumes from residue in the barrels that he inhaled during this work were so strong that he had to leave the room occasionally by special permission of his foreman. He remained on this assignment until February 21, 1978, with intermittent outside work.

It appears that there was no period during this employment when Flowers was not lifting barrels. While on the furnace job he was lifting and turning them on end to place them on the conveyor. In the cutting room he lifted them off the conveyor to work on them, and then lifted them back onto the conveyor. During breathing respites from cutting room work, he unloaded barrels from trucks and railroad cars. From Christmas 1974 to April 1975, he did nothing but unload and stack barrels weighing 35 to 50 pounds, stacking them 4 high and 6 high while standing on other barrels to stack and unstack the higher ones.

Two particular accidents on the job contributed to Flowers' back injury. On April 15, 1975, he fell on another barrel while lifting an 85-pound cheese barrel. One week later he hurt his back again while swinging a barrel up to stack it onto another. Because of the resulting back pain, he was transferred to the cutting room.

Flowers' medical records document at least 25 visits with a doctor between January 1973 and July 1976, most of which were for a combination of ailments: back trouble, high blood pressure, and bronchial asthma. He became dizzy and passed out at home several times, and his wife administered mouth-to-mouth resuscitation. He was hospitalized after one of these episodes in 1974, and again in 1976. Flowers felt the severity of his breathing problems steadily increase. While eating lunch next to the cutting room on February 21, 1978, he had trouble breathing and was taken to a hospital emergency room. He never returned to work. Two rehabilitation specialists found Flowers to be currently unemployable.

The threshold question raised in this appeal is whether Flowers' exposure to fumes and his lifting and bending during the last 3 months of employment (the period relator was on the risk) were substantial contributing causes of his disabilities. If not, under prior decisions of this court the last insurer would not be liable for these injuries. *See, e.g., Abram v. Art Goebel Ford,* 327 N.W.2d 88, 91 (Minn.1982). For the reasons set forth below, however, we

decline to apply that analysis to this and future cases.

We have never determined what "significant contributing cause" means in percentage terms, nor have we defined that term in words; it is a term which defies definition. Decisions therefore often turn upon whether a credible medical expert can state unequivocally that the last exposure was (or was not) a "significant contributing cause." Even when such clear testimony is present, we usually do not know what that term meant to the doctor/witness, but often we must nonetheless credit such testimony. Frequently, doctors themselves express reluctance to quantify proportional development of diseases over specific time periods. *See, e.g., Busse v. Quality Insulation Co.,* 322 N.W.2d 206, 210 (Minn.1982); *Carlson v. Flour City Brush Co.,* 305 N.W.2d 347, 351 (Minn.1981). When so qualified, expert testimony is a less than satisfying basis for apportioning liability.

We therefore conclude there is a need for a "bright line" rule imposing liability for an *occupational disease* contracted during a *single employment* upon the carrier on the risk when the disease resulted in disability. "In the case of occupational disease, liability is most frequently assigned to the carrier who was on the risk when the disease resulted in disability, if the employment at the time of the disability was of a kind contributing to the disease." 4 Larson, The Law of Workmen's Compensation § 95.21 at 17–79, 17–80 (1982) (footnote omitted). Where the employee has worked for a single employer during the development of the disease, requisite causation exists to impose liability upon the carrier who was on the risk when the disease resulted in disability.

This rule will work no injustice on any individual carrier because the law of averages will equalize the burden among the compensation insurers of this state. Each insurer will, on the average, become liable for its proportionate share of the claims against its insureds. Also, the compensation record and the particular hazards of that employer's activities will be factored into the premiums paid by that employer so

that insurers will continue to be fairly compensated for the risks assumed. Just as an insurer may be liable for an accident occurring on the first or last day of coverage, so may it expect disablement by occupational disease to occur randomly.

Precisely because of such randomness, this approach will allocate loss more economically and efficiently. It will also reduce counsel's temptation to join all previous insurers, and thus avoid a "battle of experts" such as that which occurred in this case. The savings in time and cost should be significant. To the extent that our decisions in *Abram* and its predecessors conflict with the bright line rule adopted here, those decisions are overruled.

Applying this rule to the present case, the decisions of the compensation judge and Workers' Compensation Court of Appeals imposing liability upon relator are affirmed.[1]

The reasoning which prompts our adoption of the rule set forth above applies with equal force to relator's request for apportionment. It is even more difficult for medical personnel and the finder of fact to quantify the contributions to causation for two or more periods of coverage than for the single most recent period. Therefore, apportionment of liability for *occupational disease* during a *single employment* is also unavailable in this and future cases.[2]

Affirmed.

---

1. Relator suffers no particular hardship by this application for under *Abram v. Art Goebel Ford,* 327 N.W.2d 88 (Minn.1982), and its predecessors, the result in this case would have been no different. There was medical testimony of continuing causation, and evidence of continuous exposure with regard to both injuries. Where evidence does not require reasonable minds to adopt a contrary view, findings of the Court of Appeals will not be disturbed on appeal. *Talmadge v. Medtronic, Inc.,* 315 N.W.2d 433, 437 (Minn.1982).

2. Since the statutory provision allowing apportionment of compensation for occupational disease was repealed in 1973, Act of May 24, 1973, ch. 643, § 12, 1973 Minn.Laws 1584, 1594, this court has denied apportionment in the following cases: *Carlson v. Flour City Brush Co.,* 305 N.W.2d 347 (Minn.1981) (back injury); *Michels v. American Hoist & Derrick,* 269 N.W.2d 57 (Minn.1978) (minute trauma to the back); *Jensen v. Kronick's Floor Covering Service,* 309 Minn. 541, 245 N.W.2d 230 (1976) (carpal tunnel syndrome injury to the hands).