Florian H. RADERMECHER,
Respondent,

v.

FMC CORPORATION and Liberty Mutual Insurance Company, Relators,

FMC Corporation and Kemper
Insurance Company,
Respondents,

FMC Corporation, self-insured,
Respondent,

Blue Cross/Blue Shield of Minnesota,
intervenor, Respondent,

Equitable Life Assurance Society of
U.S., Intervenor.

No. C3–85–478.

Supreme Court of Minnesota.

Oct. 18, 1985.

David J. Odlaug, St. Paul, for FMC and Liberty Mut.

Michael H. Streater, St. Paul, for Equitable Life Assurance.

George L. May, Hastings, for Florian Radermecher.

William R. Pederson, Minneapolis, for FMC and Kemper Ins. Co.

Eugene J. Flick, St. Paul, for FMC self-insured.

Indu S. Advani, St. Paul, for Blue Cross/Blue Shield.

## OPINION

SIMONETT, Justice.

In this appeal, the employee, working for a single employer, contracted cancer as a result of treatments for dermatitis resulting from his employment. The issues raised are whether the cancer condition is compensable, which of several insurers is liable, what should be the compensation rate, and whether the internal organs statute applies. We affirm the rulings made below.

Employee, Florian H. Radermecher, worked for 32 years for his employer, FMC Corporation (and its predecessor Northern Ordnance), from 1951 to his retirement on August 3, 1983, at age 62 for ill health. From 1951 to 1964, the employer was insured by Aetna Casualty and Surety Company; from 1964 to 1975, by Liberty Mutual Insurance Company; from 1975 to 1978, by Kemper Insurance Company; and since then FMC has been self-insured.

Soon after starting work, the employee developed a form of dermatitis known as chloracne as a result of working with hot wax vapors containing chlorinated naphthalene used in a chrome plating process. In October 1951, the employer filed a first report of injury for the chloracne condition with Aetna, and Radermecher began treatment with Dr. Laymon, a dermatologist. The employee was given ultraviolet light treatments approximately twice a week during the early 1950's, later decreased in frequency to once a week through at least 1959. It is unclear if the employee received ultraviolet treatments after 1960 except for one documented treatment on Sep-

tember 7, 1966. Aetna paid for the treatments during the 1950's, and Liberty paid for the September 1966 treatment.

In 1967 or 1968, FMC switched to a different, lower temperature wax which did not contain chlorinated naphthalene, and thereafter the employee noted that the chloracne "[p]retty much disappeared," except for occasional problems. Also, in 1970, the employee's job duties changed so that he was involved only occasionally with the hot wax plating process. In April 1973, a small pimple on the employee's chest was diagnosed as malignant melanoma. The pimple and a patch of surrounding skin were removed. After a 2½-week recovery, the employee returned to work, feeling no ill effects and earning full wages. In 1977 another cancerous melanoma was removed from the employee's chest together with another patch of skin. Once again the employee was back at work within 3 weeks earning full wages. In August 1981, it was discovered that the original melanoma had metastasized to the employee's right lung, requiring partial removal of the lung. After about 7 weeks' recovery, the employee returned to work at full wages, although receiving chemotherapy from November 1981 to January 1982.

In May 1982 Radermecher brought a claim against his employer for temporary total disability during the periods of recovery from the three operations. The employer moved to join Aetna, Liberty, and Kemper as parties to the claim proceeding. The motion was granted as to Liberty and Kemper but denied as to Aetna. On August 31, 1983, feeling he was not well enough to do his job, Radermecher "retired," and then filed an amended claim petition seeking also permanent total and permanent partial disability benefits. The hearing was held before the compensation judge for 3 days beginning November 30, 1983.

The compensation judge found that the employee's cancer was causally related to the ultraviolet treatments and therefore compensable as an occupational disease. Purportedly following *Flowers v. Consolidated Container Corp.*, 336 N.W.2d 255 (Minn.1983), the compensation judge ruled that the "last significant exposure" to therapeutic ultraviolet light occurred while Liberty was on the risk and he, therefore, put liability on Liberty. It was also on the basis of *Flowers* that the compensation judge had refused to join Aetna as a party. The compensation judge denied the employee's claim for permanent partial disability benefits under the internal organs statute, Minn.Stat. § 176.101, subd. 3(40), which became effective August 1, 1973, apparently on the grounds that it was the law in April 1973, when the cancer "first became apparent," that governed the employee's claim. For the same reason, the judge calculated the benefits payable on the basis of the employee's 1973 wages.

The Workers' Compensation Court of Appeals, with minor exceptions not here relevant, affirmed the compensation judge's findings. The court stated that the cancer was properly considered to be an occupational disease and that *Flowers* applied. Although the compensation judge had imposed liability on the insurer at risk during the "last significant exposure," the court deleted the word "significant," holding that *Flowers* imposes liability on the insured at risk during the last exposure, even if that exposure is insignificant, to the hazard causing the disease. The outcome was the same, however; Liberty Mutual was held liable for all disability payments. Liberty Mutual appeals. The employee also appeals, claiming error in the use of the 1973 compensation rate and denial of benefits for partial loss of an internal organ.

## ISSUES

1.  Is the employee's melanoma work-related, and, if so, is the melanoma an occupational disease or a secondary, subsequent nonemployment injury?

2.  In assigning liability for the employee's melanoma, should the *Flowers*

bright line rule or some modification thereof be applied?

3. What law governs in fixing the compensation rates for the employee's disabilities? And does the internal organs statute, effective August 1, 1973, apply?

## I.

█ The compensation judge found, and the WCCA agreed, that Radermecher's malignant melanomas were causally related to prolonged exposure to ultraviolet light in the treatment of his chloracne. Although there was disputed medical testimony on the issue, viewing the facts in the light most favorable to the findings, we cannot say that the findings are manifestly contrary to the evidence or that it is clear that reasonable minds would come to a contrary conclusion. *Hengemuhle v. Long Prairie Jaycees*, 358 N.W.2d 54, 61 (Minn.1984).

The next question is how the compensable melanoma is to be characterized for purposes of the Workers' Compensation Act. The compensation judge held, and the WCCA agreed, that the skin cancer was an occupational disease. Liberty Mutual disagrees and says the cancer is a secondary or subsequent nonemployment injury, which should relate back to the "primary injury," which presumably occurred during the time Aetna was on the risk. We hold that the skin cancer is to be treated as an occupational disease.

█ Minn.Stat. § 176.011, subd. 15 (1983), provides that an occupational disease "means a disease arising out of and in the course of employment peculiar to the occupation in which the employee is engaged and due to causes in excess of the hazards ordinary of employment"; the statute then goes on—

Ordinary diseases of life to which the general public is equally exposed outside of employment are not compensable, *except where the diseases follow as an incident of an occupational disease* * *. [Emphasis added.]

Here, concededly, the chloracne is a job-related occupational disease. Chloracne, however, according to the medical testimony, does not cause melanoma. Therefore, argues Liberty Mutual, it cannot be said that the disease of melanoma follows as an incident of chloracne; rather it follows as an incident of the treatment for chloracne. We do not think the statutory language is to be applied with such logical nicety. The fact is that the ultraviolet light treatments would not have been necessary but for the chloracne and, in that very real sense, the melanoma was a disease that follows as an incident of the occupational disease of chloracne and, therefore, is included as an occupational disease under the statute.

## II.

Which insurer, then, is liable for the melanoma? Liberty Mutual argues it should be Aetna, which was on the risk from 1951 to 1964, when the employee had chloracne and was receiving ultraviolet light treatments (at least up to 1960), even though the melanoma had not manifested itself during those years. The employer as self-insurer, although it was on the risk for the lung surgery and at the time of retirement, says liability should be on Aetna, or in the alternative against any of the other insurers. Kemper, although it was on the risk for the second melanoma surgery, says it is not liable because the employee received no ultraviolet treatments between 1975 and 1978 when it was on the risk. Finally, the employee Radermecher says that Liberty, Kemper, and FMC (self-insured) should all be liable for the periods of disability when they were on the risk.

In *Flowers v. Consolidated Container Corp.*, 336 N.W.2d 255 (Minn.1983), this court created a bright line rule for insurer liability in cases of occupational disease involving a single employer. We said no longer would liability be put on the last insurer on the risk when the employment was a significant contributory cause of the disability. We observed that the test of

"significant contributory cause" defied definition and provoked wasteful litigation. Instead, we said liability would be put on the insurer on the risk "when the disease resulted in disability." *Id.* at 257. This rule requires, however, as we stated in *Flowers*, that the employment at the time of the disability was, quoting Professor Larson, "of a kind contributing to the disease." *Id.* at 257.

In *Flowers*, the employee, after 7 years of lifting and breathing chemical fumes, had to quit and was deemed disabled after his last day of work. Mr. Flowers, in other words, was exposed to the hazards causing his lung disease right up to the time he quit working. In this case, on the other hand, we do not have continuing causation to date of the employee's retirement for ill health. Clearly, under *Flowers*, the self-insured FMC, on the risk from 1978 to the employee's retirement in August 1983, cannot be liable. At no time during this period did the employment contribute to the employee's cancer. During this period Radermecher was not exposed to the hazard of cancer, the ultraviolet treatments. Indeed, he was not even exposed to the hazard of chlorinated naphthalene, which caused the chloracne. Neither can Kemper, on the risk from 1975 to 1978, be held liable, for the same reasons.

■ The *Flowers* bright line rule was formulated in a factual situation where the employee's exposure to the occupational disease hazard continued until the occurrence of the employee's disablement. It was with this in mind that we said liability was on the insurer on the risk "when the disease resulted in disability." A more ac-curate statement, however, would be that liability is on the last insurer on the risk at a time when the employment is of the kind that contributes to the disease. This causal connection need not be substantial or significant.[1] Thus in *Flowers*, even though the employee had been exposed to the disease hazard for 7 years, liability was imposed on the insurer who was on the risk for only the last 3 months.

■ Our case here is unusual because it contains an element of double causation. The job causes the chloracne, which in turn necessitates the cancer-causing treatment, but the two kinds of causation may not always run concurrently. Because, however, it is the treatment that causes the cancer, we hold that liability is on the last insurer on the risk when the treatment contributes in some, even if attenuated, degree to the cancer.[2]

Liberty was on the risk from 1964 to 1975. During that time the employee was exposed to chlorinated naphthalene until 1967 or 1968, but, except for one documented treatment on September 7, 1966, it is unclear if the employee received any other ultraviolet light treatments while Liberty was on the risk. The medical testimony was that the one treatment "in and of itself" could not be a "significant factor" in causing the cancer. Nevertheless, the evidence is clear that prolonged exposure to ultraviolet light was the causative factor here. Viewed as part of this continuum, it cannot be said that the further exposure to ultraviolet light on September 7, 1966, was not, in some degree, even if attenuated, contributive to the cancer. This was also the view of the Workers' Compensation

---

**1.** "Just as an insurer may be liable for an accident occurring on the first or last day of coverage, so may it expect disablement by occupational disease to occur randomly." *Flowers v. Consolidated Container Corp.,* 336 N.W.2d 255, 258 (Minn.1983).

**2.** While this bright line rule applies to this case, it has a limited life, governing only cases from July 15, 1983, the date of the *Flowers* decision, to October 1, 1983, when Minn.Stat. § 176.66, subd. 10, enacted by the 1983 legislature, became effective. Under subdivision 10, when a single employer has multiple insurers, "the insurer who was on the risk during the employee's last significant exposure to the hazard of the occupational disease is the liable party."

Court of Appeals.[3] We hold that the evidence satisfies application of the *Flowers* bright line rule to Liberty.

We affirm, therefore, the decision of the Workers' Compensation Court of Appeals that Liberty Mutual, the last insurer on the risk when the employee was exposed to ultraviolet treatment, is liable to Radermecher for compensation benefits.

### III.

The next issues, raised by the employee, are whether the compensation judge and the WCCA erred in determining the compensation rate to be governed by the law as it was in 1973 and in denying benefits for loss of internal organs.

■ The compensation to be received is fixed by the law in force at the time a compensable injury occurs. *Fink v. Cold Spring Granite Co.*, 262 Minn. 393, 400–01, 115 N.W.2d 22, 28 (1962). When an employee has an occupational disease, a compensable injury is deemed to occur when disability occurs. Minn.Stat. § 176.-66, subd. 2 (1972). Disability for an occupational disease occurs when the employee is disabled from earning full wages. *Abram v. Art Goebel Ford*, 327 N.W.2d 88, 91 (Minn.1982). In this case the employee contends that there was a series of four separate disablements, in 1973 for the first melanoma surgery, again in 1977 for the second melanoma surgery, in 1981 for the lung surgery, and, finally, in 1983 upon retirement. The employee cites *Langlais v. Superior Plating, Inc.*, 303 Minn. 213,

216–17, 226 N.W.2d 891, 894 (1975), in support of his position.

■ We hold that disablement occurred in April 1973 when Radermecher was hospitalized for surgery on the first melanoma. During the 2½-week recovery period that followed, the employee did not work and was disabled from earning full wages. Indeed, for this period, the employee has been awarded temporary total compensation benefits.[4]

We disagree with the employee that the subsequent hospitalizations and the retirement should be deemed separate disablements. *Langlais* is not on point. There we held that two separate periods of hospitalization for a pulmonary disease constituted separate disablements where the employee had been "rehabilitated" after the first hospitalization but then returned to work to "renewed exposure to [the same] harmful elements," resulting in another disablement. *Id.* at 217, 226 N.W.2d at 894. After Radermecher had his first melanoma surgery in 1973, he did not return to the hazardous work conditions that ultimately had caused the cancer. By 1973, Radermecher was not exposed to chlorinated naphthalene, his job duties had substantially changed, and he was not receiving ultraviolet treatments. Moreover, it was Dr. Jacoby's opinion that the first melanoma in 1973 was probably primary; that it was likely that this cancer had metastasized (spread by the lymphatic system or bloodstream) to the 1977 site, and that the

---

**3.** The compensation judge found that ultraviolet treatments were given Radermecher "from 1951 through at least 1966," although treatment "was sporadic into the 1960's." The WCCA affirmed this finding, although of the view that the single 1966 treatment was enough to satisfy the *Flowers* rule. On appeal, Liberty strenuously attacks this finding, arguing that there is no evidence of any ultraviolet treatment "into the 1960s," except for the one treatment of September 7, 1966. We think Liberty's position is well taken. Although chlorinated naphthalene continued to be used on the job to at least 1967, which would lead one to suppose that the treatments also

continued, neither Radermecher nor his wife could remember any treatments in the 1960's, and the pertinent doctor's records were unavailable. In our disposition of the case, however, deleting the unsustainable finding of fact makes no difference.

**4.** In *Flowers,* the employee also had two periods of temporary hospitalization before his "retirement," but the issue of whether the prior hospitalizations constituted disablement was apparently not raised.

lung cancer clearly was a metastasis of the earlier melanomas.[5]

■ We hold, therefore, that the compensation judge properly applied the 1973 compensation rates. Our ruling that disablement occurred in April 1973 also disposes of the employee's argument that Minn.Stat. § 176.101, subd. 3(40) (1973), the internal organs statute, should apply. We agree with the compensation judge and the WCCA that the statute does not apply because it did not become effective until August 1, 1973.

Affirmed.

---

5. On December 30, 1983, the cancer was discovered in the brain. A month later it was found in the liver. Three months of chemotherapy were undertaken before the employee died on June 28, 1984.