**Roger P. MAROSE, Relator (C1–86–1476), Respondent (C9–86–1483),**

v.

**MAISLIN TRANSPORT, Gateway Transportation and Carriers Insurance Company/Minnesota Insurance Guaranty, Respondents (C1–86–1476), Relators (C9–86–1483),**

**and**

**Minnesota Department of Public Welfare and Minnesota Department of Economic Security, Intervenors.**

Nos. C1–86–1476, C9–86–1483.

Supreme Court of Minnesota.

Oct. 9, 1987.

Thomas J. Germscheid, St. Paul, for Roger P. Marose.

Kirk C. Thompson, St. Paul, for Maislin Transport, Gateway Transp. and Carriers Ins. Co./Minnesota Ins. Co.

Minnesota Dept. of Public Welfare, Patricia Sonnenberg, Minnesota Dept. of Economic Sec., Richard Rhode, St. Paul, for intervenors.

## OPINION

COYNE, Justice.

The employer and its insurer and the employee all seek review of the Workers' Compensation Court of Appeals' amended decision modifying the findings and order of the compensation judge. The WCCA remanded this matter to the Office of Administrative Hearings to obtain medical evidence with respect to apportionment of permanent partial disability resulting from each of several injuries and to determine whether or not the work activity of the employee from February 12, 1981, through July 26, 1982, resulted in a personal injury. The WCCA directed the lower court to enter findings and an order in conformity with the evidence "on all issues" before the previous compensation judge. We affirm in part and reverse in part.

The employee, Roger P. Marose, is almost 52 years old. He started working as a dockman for the employer in March 1962 and continued in that capacity until July 27, 1982, when he was laid off because the employer was going out of business. As a dockman, the employee loaded and unloaded various types of freight from semi-trailer trucks. The weights he lifted ranged from little or nothing to 200 to 300 pounds. Sometimes he had to tip 55-gallon barrels that weighed close to 500 pounds. Employee used dollies, two-wheelers, carts, and forklifts to move heavy or bulky freight.

Prior to going to work for the employer, the employee had no problems with his back or neck. He testified that a year or two after starting this job, however, he started seeing a chiropractor, Dr. Russell Stauff, for low back pain. Medical records indicate that these visits began in November 1962. The employee testified that although he had hurt his back at work, he did not file a workers' compensation claim because, at that time, the insurance company did not pay for chiropractic treatment.[1] The employee is a very poor historian and did not remember when his various injuries

occurred. The dates used here are from his medical records.

In the fall of 1969, the employee had a sudden onset of low back pain and left leg pain while dragging a water heater out of the basement of his home. This incident resulted in a herniated disc, and, on October 20, 1969, Dr. Donald Lannin performed a laminectomy. The employee's recovery was uneventful.

On September 25, 1970, the employee was struck in the back by a forklift driven by another employee. He received initial treatment at the Northwest Industrial Clinic and was referred to Dr. Lannin when his problems persisted. The doctor concluded "that he has only sustained a soft tissue injury which is superimposed on his old back problem" and instructed him to go back to work. Dr. John Minder of the Northwest Industrial Clinic noted that no permanent disability was anticipated from this injury. After this forklift incident, Mrs. Marose had to help her husband put on his shoes and socks. His right leg pain began with this incident and has continued since that time.

On March 23, 1971, the employee twisted his back while unloading freight and missed approximately two weeks of work. On October 28, 1972, the employee again twisted his back while lifting freight. He testified that after this incident his back pain persisted.

While pulling an overloaded cart, on April 2, 1973, the employee again injured his back. In addition to the back pain, the employee also experienced radiating pain in the left leg. The employee missed over two weeks' work after this injury. Dr. Lannin treated him and advised him that he should lose weight if he wanted to remain employable.

The employee was again injured on November 4, 1974, when he attempted to lift a semi-trailer door against which freight had fallen. The employee missed approximately one week of work because of this injury.

[1]. The Workers' Compensation Act was amended in 1971 to cover chiropractic treatment. Act of June 7, 1971, ch. 863, §§ 1, 2, 1971 Minn.Laws 1712, 1712 (current version codified at Minn. Stat. § 176.135 (1986)).

Physical therapy enabled him to return to work, but he still had back pain.

On February 23, 1976, a storage deck fell from the roof of a trailer, hitting the employee on the head. He had pain above his right ear, down into his shoulders, and along his right arm. He received medical treatment and physical therapy on an intermittent basis for about one year after this injury.

The employee again injured his back on February 6, 1981. The First Report of Injury states that "[e]mployee claims this is aggravation of old back injury and that just recently his back has become progressively worse." The Physician's Report, however, indicates that before this injury the affected member was normal and that no permanent disability had resulted or might result from the injury. In fact, the only suggestion in the medical records that there would be any permanent disability from any of these injuries was Dr. Lannin's April 28, 1971, comment that he felt "that [employee] will have little or no disability which can be associated with the episode of March 23, 1971," and the only suggestion that employee's back was not normal before each injury was Dr. Minder's Physician's Report regarding the September 25, 1970, injury, which noted the 1969 surgery and that the employee had no symptoms after the surgery.

These proceedings were initiated by the employee's claim that on February 6, 1981; February 23, 1976; November 4, 1974; April 2, 1973; October 28, 1972; and March 23, 1971, he sustained injuries which aggravated his previously injured back, resulting in temporary total disability from July 27, 1982. At the hearing, the employee amended his claim to allege injury to the back on September 25, 1970. He also amended his claim to allege a *Gillette* injury resulting from his work activity from February 6, 1981, to July 27, 1982—i.e., a personal injury arising out of and in the course of employment as a result of the cumulative effect of repetitive minute trauma over a period of time, *see Gillette v. Harold, Inc.*, 257 Minn. 313, 321-23, 101 N.W.2d 200, 206-07 (1960). Employee testified that his back pain became worse in February 1981 and that he told his foreman about this, but was told to go back to work. The employee sought medical treatment for his back in March 1981 and missed some work. Dr. Keith Bakke noted that the employee "needs to be off from work for at least the next four or five days because of the type of work he does." Several coemployees testified that the employee complained of pain in his back and neck and that it got worse as time went on. They also testified that he had trouble performing his job duties, that his production was down, that he frequently left early, and that they helped him when they could.

The medical experts, Drs. Lowell Lutter, Robert Wengler, and David Boxall, agree that the employee is permanently partially disabled, although they disagree about the extent and the cause of that disability. All three attribute some of the disability to the 1969 laminectomy (7.5%, 15%, and 10% respectively); all attribute some to the forklift injury (7.5%, 10%, and 2.5%); all attribute some to the neck injury (5%, 10%, and 5%); and Dr. Boxall also attributes 2.5% to the other incidents. One of the problems with these varying apportionments is that the employee gave the doctors inconsistent accounts of his injuries. That the examinations took place over a period of 15 months may have done little to improve the employee's ability to give an accurate medical history. Dr. Lutter examined the employee on November 8, 1983, and on January 9, 1984; Dr. Wengler's examination was made on August 2, 1984; and Dr. Boxall saw him on February 7, 1985. Drs. Lutter and Boxall found 20% permanent partial disability and Dr. Wengler found 35%. The compensation judge and the WCCA accepted the latter figure.

While there is evidence that the employee's condition worsened over time, there is no evidence that the deterioration was caused by the daily trauma of his regular work from February 6, 1981, to July 27, 1982. All of the medical testimony attributes employee's total disability to specific incidents. As Dr. Wengler put it, "[a] reasonable case could be made for a Gillette type injury except that under the circum-

stances where clearly defined injuries occur which are followed by documentable disability it is my opinion that the impairment should be held to be the responsibility of the specific injuries."[2] Nevertheless, the compensation judge found a *Gillette* injury and ignored the experts' apportionments, opining that "the apportionments of blame to the employee's back permanency are speculative and conjectural."

The WCCA unanimously agreed that the record includes substantial evidence to support the compensation judge's determination that from and after July 27, 1982, the employee has been temporarily partially disabled as a result of personal injury arising out of and in the course of employment. The WCCA also agreed unanimously that the evidence does not permit a finding that the employee sustained a *Gillette* injury on July 27, 1982, when his employment was terminated because the employer was going out of business. The WCCA divided, however, on the disposition of the *Gillette* injury claim. By majority decision the case was remanded for rehearing on all issues; the dissenting judge would have awarded temporary total disability benefits at the compensation rate in effect on February 6, 1981, the date on which the employee sustained the last of the several work-related injuries he proved.

■ The employer contends that the WCCA exceeded its authority when it remanded this matter to the Office of Administrative Hearings with directions to obtain medical evidence with respect to whether the work activity of the employee from February 12, 1981, through July 26, 1982, constituted a personal injury arising out of and in the course of employment as a result of the cumulative effect of repetitive minute trauma and to enter findings and an order in conformity with the evidence on all of the issues before the compensation judge on the previous hearing. This remand was authorized, however, by Minn. Stat. § 176.441, subd. 1 (1984), *repealed by* Act of March 25, 1986, ch. 461, § 37, 1986 Minn.Laws 942, 961 (effective Aug. 1,

1986). That subdivision provided as follows:

Subd. 1. Disposition by workers' compensation court of appeals. Where an appeal has been taken to the workers' compensation court of appeals under this chapter, on either the ground that the findings or order or both were unsupported by substantial evidence in view of the entire record as submitted * * *, the workers' compensation court of appeals may:

(1) grant a hearing based on the record before the compensation judge; or,

(2) remand the petition for a de novo hearing or a rehearing and notify the chief administrative law judge, who shall assign the de novo hearing or the rehearing before a compensation judge; or,

(3) sustain, reverse, or modify the order appealed from.

Minn.Stat. § 176.441, subd. 1 (1984) (repealed 1986). In the notice of appeal to the WCCA, the employer asserted that the findings and orders appealed from were unsupported by the evidence; therefore, Minn.Stat. § 176.441, subd. 1 (1984), is applicable.

Despite its 1986 repeal, section 176.441, subd. 1, is nevertheless applicable in this case because "the workers' compensation law in effect at the time of injury governs, absent a clear manifestation of legislative intent to the contrary." *Hengemuhle v. Long Prairie Jaycees*, 358 N.W.2d 54, 58 (Minn.1984); *see Leahy v. St. Mary's Hospital*, 339 N.W.2d 265 (Minn.1983); *see also* Minn.Stat. § 645.21 (1986) ("No law shall be construed to be retroactive unless clearly and manifestly so intended by the legislature."). The 1983 amendment of section 176.441, subd. 1 clearly manifested a legislative intent that it should have retrospective application:

[These changes] are procedural changes and are effective for all cases pending on July 1, 1983, regardless of the date of injury, date of hearing, or date of appeal and all decisions of workers' compensa-

**2.** The employee denigrates Dr. Wengler's rejection of the theory of a *Gillette* injury by calling it a legal conclusion, but it appears to us to reflect Dr. Wengler's medical judgment.

tion judges and the workers' compensation court of appeals issued on or after July 1, 1983, shall apply [them].

Act of June 8, 1983, ch. 301, § 236, 1983 Minn.Laws 1558, 1718–19. The 1986 changes, on the other hand, did not state an effective date and did not provide for their application in cases arising prior to the effective date. Instead, the amendments became effective on August 1, 1986, pursuant to Minn.Stat. § 645.02 (1986), and, therefore, Minn.Stat. § 176.441, subd. 1 (1984), which allows remand for a rehearing, governs matters then pending.

Inasmuch as the WCCA determined that the employee has been temporarily disabled since July 27, 1982, there would be little reason to remand for an additional hearing solely to determine whether or not the employee's work activity after his February 1981 injury contributed to that disability. While the employee introduced testimony that his condition had deteriorated during the last year or two of his employment, he made no attempt to prove a causal connection between his ordinary daily work and his total disability. *Fisher v. Red & White Taxi Co.*, 270 Minn. 317, 325, 133 N.W.2d 543, 548 (1965). The only medical expert who even mentioned a *Gillette* type injury expressly declined to so characterize the employee's injury. Since the WCCA unanimously agreed that the employee had failed to prove a *Gillette* type injury, it may be that an award of compensation at the rate in effect on February 6, 1981, when employee suffered the last of his proven work-related injuries, is the only reasonable disposition of the claim. Nevertheless, since we are of the opinion that remand is required for another reason and since we hold that the WCCA did not exceed its authority in remanding for a de novo hearing on all issues, we decline to reverse the decision of the WCCA. On remand the compensation judge may rely upon evidence already submitted and any additional evidence adduced.

The hearing on remand cannot be limited, however, to the determination whether the employee sustained a *Gillette* type injury on July 27, 1982, but must also include allocation of the permanent partial disabili-ty resulting from employee's several injuries—a determination which, like the question of the *Gillette* injury, depends primarily on medical evidence.

■ In a finding which the WCCA left undisturbed, the compensation judge determined that employee's claims with respect to injuries sustained through November 4, 1974, were barred by the applicable statute of limitations, Minn.Stat. § 176.151, subd. 3 (1974), which required that any proceeding to determine or recover compensation for an injury be brought within eight years of the last payment of benefits on account of such injury. The last benefit connected with any injury sustained on or before November 4, 1974, was no doubt paid more than eight years prior to the filing of employee's claim petition in 1984. The limitation statute in question, however, was repealed by 1975 Minn.Laws, ch. 359, § 17, long before the statute had run against employee's earliest injury claim. This court has held that an amendment to the limitation fixed by the Workers' Compensation Act was applicable to all cases where the former statute had not run before the new limitation statute took effect. *State ex rel. Donovan v. Duluth Street Ry. Co.*, 150 Minn. 364, 185 N.W. 388 (1921). Both before the enactment and after the repeal of section 176.151(3), it was recognized that the payment of disability benefits or medical expenses by an employer following a compensable injury may constitute an "action or proceeding" within the meaning of Minn.Stat. § 176.151(1) (1986) so that the employee's petition for permanent partial disability benefits is not subject to the bar of the statute. *Savina v. Litton Industries/Litton Medical Systems*, 330 N.W.2d 456, 457 (Minn.1983); *Knopp v. Gutterman*, 258 Minn. 33, 102 N.W.2d 689 (1960). Accordingly, we reverse the WCCA with respect to the viability of employee's claims for injuries sustained on September 25, 1970; March 23, 1971; October 28, 1972; April 2, 1973; and November 4, 1974, and hold that if a "proceeding" was commenced within the time limitations of section 176.-151(1), employee may prove his claim for

permanent partial disability resulting from those injuries.

■ Employee must also prove on remand the quantum of disability attributable to each injury. The WCCA has affirmed the compensation judge's determination that the employee's present permanent partial disability is 35% of the back, but the portion of that disability attributable to each injury must be determined so that the amount of permanent partial disability compensation payable on account of each injury can be calculated properly. While the scheduled compensation for permanent injury to the back (percentage of 350 weeks) has not changed from the time of the first to that of the last of employee's injuries, his wages undoubtedly have changed from time to time. The process of attributing a specific permanency rating to each of several work-related injuries for which the employee seeks compensation in a single proceeding is sometimes termed "apportionment." That process, however, has nothing to do with equitable apportionment—the proportionate allocation of liability among various employers and insurers—and arguments based on equitable apportionment are inapposite here. While the amount of compensation payable is unaffected by equitable apportionment, to relieve the employee of his obligation to assign a percentage of disability to each injury might change the amount of permanent partial disability compensation to which he is entitled. The amount of compensation payable for permanent partial disability should not depend on the number of employers or insurers implicated in the contributing injuries. Although employee's medical history spans both several years and several injuries, none of the medical experts were unable to rate the disability resulting from his various injuries. The disparity in the ratings seems to be attributable primarily to the employee's apparent inability to give a consistent account of his injuries—a problem which can no doubt be resolved on remand by furnishing the examining physicians an accurate medical history.

Affirmed in part, reversed in part, and remanded.

SCOTT and YETKA, JJ., dissent.

SCOTT, Justice (concurring in part and dissenting in part).

Although I concur in the majority's conclusions that the WCCA had the authority to remand this matter for additional testimony and to direct the compensation judge to enter findings on all issues and that if a "proceeding" was commenced within the time limitation of section 176.151(1) the employee may prove his claim for permanent partial disability resulting from his early injuries, I respectfully dissent from the conclusion that the employee's permanent partial disability must be apportioned among his various injuries.

Here, the employee suffered a variety of injuries for which he never received permanent partial disability but which the employer now claims contributed to this disability. I would hold that any uncompensated disability resulting from these earlier injuries is a preexisting condition, which, if substantially aggravated by his last work injury, should be fully compensable at the rate applicable to that final injury. In *Vanda v. Minnesota Mining & Manufacturing Co.*, 300 Minn. 515, 516, 218 N.W.2d 458, 458 (1974), we stated:

> [W]hen the usual tasks ordinary to an employee's work substantially aggravate, accelerate, or combine with a preexisting disease or latent condition to produce a disability, the entire disability is compensable, no apportionment being made on the basis of relative causal contribution of the preexisting condition and the work activities.

(Citations omitted). I would, therefore, reverse the WCCA with regard to apportionment and hold that, in this case, there should be no apportionment of the employee's permanent partial disability but instead the whole permanent partial disability should be compensated at the rate applicable to the last compensable personal injury.

We have also held that when an employee suffers both specific injuries and a *Gil-*

*lette* injury, equitable apportionment is "applicable only in those rare cases in which substantial and almost uncontroverted medical testimony will permit a precise allocation of responsibility between or among different employers or insurers for the employee's disability." *Michels v. American Hoist & Derrick*, 269 N.W.2d 57, 59 (Minn.1978). Because we are remanding the issue of the alleged *Gillette* injury, the compensation judge may again find that this employee indeed suffered such an injury. If there were a *Gillette* injury, apportionment would be inappropriate because the medical testimony is not almost uncontroverted. Dr. Wengler attributes twice as much disability to the 1969 laminectomy as does Dr. Lutter. Dr. Wengler, moreover, attributes four times more of the disability to the forklift accident than does Dr. Boxall. This certainly is not uncontroverted testimony and, therefore, there should be no apportionment.

YETKA, Justice.

I join in the dissent of Justice Scott.