Mark A. STONE, Respondent,

v.

LAKEHEAD CONSTRUCTORS, et al., Oxford Construction, et al., and Max Gray Construction, et al., Respondents,

and

Ray Riihiluoma, et al., Relators,

and

Mancuso Oil Company, et al., Respondents,

and

Minnesota Department of Labor & Industry, intervenor, Respondent.

No. CX–94–2168.

Supreme Court of Minnesota.

June 16, 1995.

---

James A. Wade, Greg King, Johnson, Killen, et al., Duluth, for appellant.

James Balmer, Sean Quinn, Falsani, Balmer, et al., Duluth, for Mark Stone.

Steven C. Gilmore, Gilmore, Aafedt, Ford, Anderson & Gray, P.A., Minneapolis, for Lakehead Constructors, et al.

Paul W. Godfrey, Brown & Holman, Minneapolis, for Oxford Const., et al.

Karen R. Swanton, Minneapolis, for Max Gray Constr., et al.

Mark J. Freeman, Fitch, Johnson, Larson, Walsh & Held, Minneapolis, for Mancuso Oil Co., et al.

Vic Schulz, MN Dept. of Labor & Industry, St. Cloud, for Dept. of Labor & Industry.

## OPINION

COYNE, Justice.

During a period of about 19 months Mark A. Stone, a 34-year-old construction carpenter, sustained a series of low back injuries arising out of and in the course of his employment. Each injury occurred while Stone worked for a different employer. The compensation judge found that the employee had sustained permanent partial disability of 10.5 percent of the whole body as a result of the entire series of injuries, and he equitably apportioned both temporary total disability benefits and permanent partial disability benefits equally among four employers. The Workers' Compensation Court of Appeals affirmed except as to the equitable apportionment of permanent partial disability benefits. With respect to permanent partial disability benefits, the WCCA reversed and remanded for reallocation pursuant to Minn.Stat. § 176.101, subd. 4a (1994), among the four employers. We affirm in part and reverse in part.

Stone was first injured on May 24, 1990 while working for Lakehead Constructors. He hurt his lower back while moving water-soaked wood, but he kept on working and did not seek medical attention because he did not want his employer to consider him a "whiner." A few days later Lakehead laid Stone off. Contrary to Stone's expectation, however, his back pain did not subside and since

that injury the employee has continually suffered low back pain of varying intensity.

Stone then worked for Oxford Construction, but on June 10, 1990, when he picked up a 50– to 100–pound toolbox, he felt a pop in his back in the same area that he had hurt a couple of weeks earlier. Stone told his supervisor and was treated by a chiropractor. Stone continued working without loss of worktime until his layoff by Oxford in midsummer 1990.

Stone then went to work for Max Gray Construction. In September 1990 the employee was fitted with a back brace which he wore at work until Max Gray laid him off in the late fall of 1990. The following spring Stone returned to Max Gray's employ. In August of 1991, while working for Max Gray, he sustained a third low back injury. Once again Stone lost no time from work on account of his injury, but he did get medical attention.

In late November or early December 1991 Stone began working for Ray Riihiluoma on a construction project at Hibbing–Chisholm Airport. Although Stone believed he could perform the duties of the work when he began working on the hangar construction project, during the course of the work he encountered increasing difficulty doing his job, and by the time he was laid off from the airport project on January 22, 1992, Stone's low back condition had deteriorated substantially. His back was much worse than it had been when he started working for Riihiluoma, and his leg was numb.

In late January and in February 1992 Stone worked sporadically delivering fuel oil for Mancuso Oil but after working a total of 10.65 hours he had to quit because of low back pain.

In March 1992 a CT scan disclosed a bulging disc at L3–4, central disc protrusion at L4–5 and mild facet joint hypertrophy at L4–5 and L5–S1 levels. The employee came to the realization that he could no longer perform essential aspects of his work as a construction carpenter, and on April 27, 1992, he informed his supervisor at Lakehead of the incident which occurred on May 24, 1990, while he was removing a catwalk. In May 1992 his physician advised Stone to refrain from all work, and when he was released to resume work with restrictions, he was told to not return to construction work.

Stone filed a claim for workers' compensation benefits against five employers: Lakehead, Oxford, Max Gray, Ray Riihiluoma, and Mancuso Oil. All denied liability, and Lakehead also denied that it had received timely notice.

At the hearing on Stone's claim, testimony of six physicians—each of whom offered a different opinion with respect to the extent and the cause of Stone's disability—was admitted. The only issue on which they all agreed was that Stone's work at Mancuso Oil was not a factor in his present condition. One physician opined that Stone had suffered no impairment; the other adverse examiners were of the opinion that although Stone had indeed sustained permanent partial disability as a result of work injuries during his employment by either three or four of the named employers, he also had spondylolisthesis which predated any of his work-related injuries and constituted a preexisting impairment that most of them rated at 7 percent.

Dr. Duane F. Person, employee's orthopedic consultant, diagnosed a chronic lumbosacral sprain superimposed on degenerative arthritis at L4–5 and L5–S1, which caused Stone's 10.5 percent permanent partial disability. Dr. Person was of the opinion that the specific incidents of injury at Lakehead, Oxford, and Max Gray, and a *Gillette* injury sustained while he was employed by Ray Riihiluoma each contributed in equal measure to Stone's permanent partial disability. Dr. Person also pointed out that the 1979 X-ray report, on which diagnoses of spondylolisthesis were based, had been shown by subsequent diagnostic testing to be erroneous. Although Dr. Michael Davis, medical consultant for Max Gray, attributed part of Stone's disability to a preexisting spondylolisthesis, he, too, rated his present impairment at 10.5 percent and attributed responsibility to Lakehead, Oxford, Max Gray and Ray Riihiluoma.

The compensation judge found that Stone had sustained four work-related injuries, all of which were substantial contributing causes

of his permanent partial disability, and he also found that Stone did not have a preexisting spondylolisthesis. The compensation judge was persuaded that Drs. Person and Davis had correctly rated Stone's present impairment at 10.5 percent, and he adopted Dr. Person's assignment of equal responsibility for the impairment to each of the four injuries. Based on principles of equitable apportionment, he awarded temporary total and temporary partial disability compensation and impairment compensation, medical and rehabilitation benefits to be paid 25 percent by each of the following employers and their insurers: Lakehead,[1] Oxford, Max Gray, and Ray Riihiluoma.

On appeal of Lakehead, Oxford and Riihiluoma, the WCCA affirmed except as to the equitable apportionment of impairment compensation. Concluding that liability for permanent partial disability benefits must be allocated pursuant to Minn.Stat. § 176.101, subd. 4a (1994), the WCCA reversed and remanded for reapportionment of permanent partial disability pursuant to Minn.Stat. § 176.101, subd. 4a (1994) and Minn.R. 5223.0250 (1992).

 We affirm with respect to the award and equitable apportionment of temporary total and temporary partial disability compensation and medical rehabilitation benefits but are constrained under the circumstances of this case to reverse with respect to the reapportionment of impairment compensation. We are not unmindful of the employee's obligation to prove the quantum of disability attributable to each of several injuries, *see Marose v. Maislin Transport,* 413 N.W.2d 507, 513 (Minn.1987), and ordinarily we would agree with the WCCA that permanent partial disability benefits should be apportioned pursuant to Minn.Stat. § 176.101, subd. 4a (1994). Here, however, where the employee sustained injury to the same area of his back on three specific occasions and, finally, a further injury, characterized as a *Gillette* injury, to the same part of his back, with each injury following so closely on the heels of the prior injuries that employee's condition never stabilized sufficiently to justify a contemporaneous rating of permanent disability and where the difference between the highest and lowest hourly wage rate of this union construction carpenter was no more than 37 cents, it seems to us neither necessary nor advantageous to require assignment of a permanency rating applicable to each of the four injuries. The diversity of the expert medical opinions concerning allocation of liability for permanent partial disability demonstrates not only the difficulty of proper allocation but also that under the circumstances of this case any such allocation will be open to the same complaints of arbitrariness or insufficiency of the evidence that have been asserted with respect to the equitable apportionment already made. In short, section 176.101, subd. 4a, which is directed primarily at the reduction of the award of permanent partial disability compensation to which the employee is entitled, does not easily lend itself to the allocation of liability among several employers when a series of injuries to the same part of the employee's body occur in such rapid sequence that no permanency rating can be made between the incidents of injury. Under these circumstances, there seems to us little reason to require recalculation of compensation for permanent partial disability when the more complicated statutory format should produce the same amount of compensation to the employee. That there is no medical record of the injury sustained when Stone was working for Lakehead does not relieve the employer of the obligation to pay the compensation payable with respect to the permanent partial disability attributable to that injury. Neither does the absence of a medical record of that first injury justify assessing Max Gray for the permanent partial disability compensation payable with respect to the Lakehead injury as well as that attributable to the compensable injury sustained while Stone was in its employ. It is most unlikely that the legislature intended by Minn.Stat. § 176.101, subd. 4a (1994), to provide either a windfall of double recovery for one of the injuries to the employee or a

---

**1.** The compensation judge ruled the late notice to Lakehead was excused pursuant to the trivial injury rule.

windfall of relief to one of several employers from liability for its proportionate share of the total compensation properly payable with respect to the employee's permanent partial disability resulting from the work performed for that employer. Instead, when, as is the situation in this case, benefits are appropriately awarded on the basis of a single permanency rating of the disability resulting from more than one compensable injury, the situation seems to us better served by application of the principles of equitable apportionment. *See DeNardo v. Divine Redeemer Memorial Hosp.*, 450 N.W.2d 290, 292 (Minn.1990). Consequently, we reverse the remand for reallocation of impairment compensation and reinstate the compensation judge's allocation and award. The WCCA's decision is in all other respects affirmed. *Hengemuhle v. Long Prairie Jaycees*, 358 N.W.2d 54 (Minn. 1984); Minn.Stat. § 176.421, subd. 1(3) (1994).

Affirmed in part, reversed in part, and the award of the compensation judge reinstated.

Employee is awarded $400 in attorney fees.