HUDSON, Justice.
This case involves the 2015 workers' compensation claim for benefits filed by Alapati Noga, a former defensive lineman for the Minnesota Vikings from 1988 until 1992, who now suffers from dementia.[1] Before us are three issues related to Noga's workers' compensation claim against the Vikings: whether Noga sustained a compensable Gillette injury,[2] whether the Vikings and its insurer received adequate notice of the injury, and whether Noga satisfied the statute of limitations.
A compensation judge determined that Noga was entitled to permanent and total disability benefits. The Vikings and its insurer appealed, and the Workers' Compensation Court of Appeals (WCCA) vacated certain findings and remanded several issues relevant to those now before our court. On remand, the compensation judge resolved those issues in Noga's favor, determining that: (1) Noga sustained a Gillette injury to the head that culminated around his last day with the Vikings on December 1, 1992; (2) Noga should have known of the nature, seriousness, and probable compensable nature of his injury in 2004, and the Vikings and its insurer received adequate notice of his injury under Minn. Stat. § 176.141 (2018) in 2004;[3]
*804 and (3) the statute of limitations was satisfied under Minn. Stat. § 176.151 (2018) because the Vikings provided Noga with medical care that constituted a "proceeding." The Vikings appealed again to the WCCA, and the WCCA affirmed. The Vikings appealed to our court. Because we conclude that Noga did not satisfy the statute of limitations under Minn. Stat. § 176.151, we reverse the Workers' Compensation Court of Appeals.
FACTS
Alapati Noga was born in September 1965 in American Samoa and moved to Hawaii in 1969. Noga began playing football seriously in the ninth grade and played the position of defensive lineman throughout high school. He suffered at that time from what he called "headaches" because of his "violent" head-first style of playing. Throughout college, Noga continued playing as a defensive lineman with the same head-first style of play, but "[i]t got worse."
Before he completed his college degree, Noga was drafted by the Minnesota Vikings in the third round of the 1988 National Football League (NFL) draft. Noga played as a defensive lineman for the Vikings from 1988 until December 1, 1992. Noga continued his head-first style of tackling other players, a style of play that was then allowed by the NFL.
While playing for the Vikings, Noga sustained a number of orthopedic injuries that kept him from playing games periodically, and also experienced head injuries and headaches. On occasions when Noga had a headache after sustaining a hit, he would talk to the team trainers and doctors, who would dispense Advil and Tylenol for his headaches.
Before the compensation judge, Noga testified that there was no way to keep his orthopedic injuries from the Vikings. But, regarding his head injuries, Noga "didn't want to tell [Vikings staff] too much " because staff sometimes told him "you're always hurting." Noga testified that those statements made him feel that he should keep the head injuries to himself if he wanted to continue playing in the NFL.
Even when he experienced headaches and wooziness following a hit, Noga continued playing. Noga was "never taken out of the game right away" if he told the Vikings staff that he was feeling woozy from a hit or a play. When asked why he would continue playing if he was feeling woozy, Noga testified "[w]hen I t[old] the doctors I'm not feeling well ... I was told fight through it, it's my job, that's what they pay me for. I'll try my best to fight through it."
The Vikings' training records do not contain entries of any treatment for headaches or otherwise show that the Vikings staff provided Advil or Tylenol to Noga. The training records only mention Noga's orthopedic injuries. The training records do, however, contain a notation that on September 1, 1990, Noga "did not report for conditioning" and that he left a note stating that he "had a headache."
Noga's last day for the Vikings was December 1, 1992. He went on to play for the Washington Redskins for the 1993 season. While playing for Washington, he sustained more hits to his head. Noga's end-of season physical in January 1994 showed no history of head injuries but listed various orthopedic injuries. Washington released Noga after one season. Part-way through the 1994 season, Noga began playing for *805 the Indianapolis Colts, but his contract was not renewed.
Over the course of his NFL career, Noga played in 73 games over five seasons for the Vikings,[4] 16 games for Washington, and 4 games for Indianapolis. Noga went on to play professional football in the Arena League until 1999.
In 2001, Noga filed a claim petition for workers' compensation benefits regarding various orthopedic injuries he suffered while playing for the Vikings. In connection with this claim, Noga was examined by Dr. William Fruean in 2003. In February 2004, Dr. Fruean wrote a report summarizing Noga's medical problems, which Noga attributed to "injuries while he was playing football for the Minnesota Vikings." Dr. Fruean listed 10 orthopedic issues and 2 neurological issues: "Blackout episodes from concussions from football injuries" and "Headaches episodes, from football injuries." Dr. Fruean also stated that Noga "needed to be evaluated by a neurologist for his blackout and headaches problems." Noga's 2001 claim was settled, and an Award on Stipulation, to which Fruean's report was attached, was filed in March 2004.
Noga applied for social security disability benefits related to his "[b]ack, lower body, shoulders, and fingers" in September 2007. Although his claim was initially denied, Noga was diagnosed as legally blind in November 2008. On the basis of that diagnosis, in February 2009, the Social Security Administration determined that Noga met the medical requirements for disability benefits and that "[t]he onset of [Noga's] disability [was] ... November 17, 2008."
In general, Noga's medical and therapy records indicate numerous ongoing health problems, including chronic gout flare-ups, ongoing orthopedic issues, chronic pain, sporadic illicit drug abuse, sleep apnea, depression, legal blindness, and neurological issues. Noga saw multiple psychologists to address some of the mental health and neurological issues he was experiencing, including Dr. Gayle Hostetter and Dr. Laila Spina.[5]
In January 2011, after an extensive neuropsychological evaluation, Dr. Hostetter concluded that "Noga's general intellectual functioning shows a general decline from previous functioning, with extremely low verbal memory and problem solving/organization, meeting the diagnosis for ...dementia." Regarding causation, Dr. Hostetter indicated that "Noga's performance does not clearly indicate etiology, although multiple head trauma certainly is indicated as an important factor." Finally, Dr. Hostetter observed that "other contributing factors, such as possible under-reported substance abuse, untreated sleep apnea, and psychiatric/personality factors need to be further investigated."
*806 Central to this appeal is Noga's December 2014 examination by Dr. Thomas Misukanis, a licensed psychologist and clinical neuropsychologist. Dr. Misukanis spent 9-½ hours with Noga, during which time he interviewed Noga and administered a battery of 18 tests. Following the examination, Dr. Misukanis also conducted a review of Noga's extensive medical records.
In his evaluation report, Dr. Misukanis opined that "Noga's cognitive deficits represent moderate brain impairment which is resulting from an assortment of factors including ADHD, having English as a second language (ESL), untreated sleep apnea, chronic physical pain, cannabis use, previous methamphetamine and alcohol abuse, psychological disturbance, and a multitude of concussions/mild brain injuries incurred while playing professional football." Dr. Misukanis stated that "[w]hile [Noga's] history of concussions is clearly not the sole cause of his brain impairment, it is my impression that they are a significantly contributing factor to Mr. Noga's cognitive dysfunction." Based on his evaluation of Noga, Dr. Misukanis opined that Noga "meets criteria for the DSM-5 diagnoses of Major Neurocognitive Impairment (formerly known as Dementia )."
Following his dementia diagnosis by Dr. Misukanis, Noga filed this present claim for workers' compensation benefits in January 2015. In May 2015, at the request of the Vikings' insurer, Dr. Stanley Ferneyhough conducted a neuropsychological examination of Noga. Dr. Ferneyhough met with Noga for 2 hours and 45 minutes. He did not administer any tests although he reviewed Noga's medical records. Dr. Ferneyhough found "Noga to be totally disabled from a neuropsychological standpoint from January 1, 2013 to the present and continuing." Dr. Ferneyhough agreed with Dr. Misukanis's diagnosis but disagreed about the etiology of Noga's dementia, attributing it to Noga's past drug abuse and head trauma from a 2011 motor-vehicle accident.[6] He further opined, "[t]here is no causal relationship between Mr. Noga's alleged consequential dementia claim and his playing time while a Minnesota Vikings football player between 1988 and 1992."
A compensation judge held a hearing on April 8, 2016. The parties stipulated that, as of January 1, 2013, Noga was permanently and totally disabled and that he is entitled to the maximum compensation rate. In the findings and order filed in July 2016, the compensation judge found that Noga sustained a Gillette injury of "head trauma, brain injury, and/or dementia" that culminated "on or about December 1, 1992" and that the injury "is a substantial contributing factor to [Noga's] permanent and total disability." The compensation judge also found that Noga's claim was not barred by the notice requirement under Minn. Stat. § 176.141 or the statute of limitations set forth in Minn. Stat. § 176.151.
The Vikings appealed, and in April 2017, the WCCA affirmed in part, vacated in part, and remanded in part. Noga v. Minn. Vikings Football Club , 77 Minn. Workers' Comp. Dec. 285 (WCCA 2017). First, noting that Noga must present evidence that his work activities for the Vikings from 1988 until 1992 "were a substantial contributing cause of his condition and claim" but that the medical evidence was unclear on that issue, the WCCA vacated the compensation judge's determination that Noga had sustained a Gillette injury. Id. at 293-94. Second, because the compensation *807 judge's finding that the Vikings had received notice of the Gillette injury that satisfied the requirements of Minn. Stat. § 176.141 was "based on the determination of [the] Gillette injury," the WCCA also vacated the notice determination. Noga , 77 Minn. Workers' Comp. Dec. at 294. Third, the WCCA addressed the compensation judge's finding "that the statute of limitations for the December 1, 1992, Gillette injury was tolled by the employer's provision of medical care and treatment." Having determined that a remand was necessary on the first two issues, the WCCA vacated and remanded the statute-of-limitations issue as well. Id. at 294-95.
To address these issues on remand, both medical experts gave depositions. In a supplemental deposition, Dr. Misukanis testified that a review of Noga's testimony before the compensation judge "confirmed what [he] had believed ... concerning the frequency of [Noga's] head injuries [and] the ongoing post-concussive type symptoms that he was experiencing." Dr. Misukanis explained that brain injuries "are on a continuum, from the most severe brain injuries that cause death or extended coma to the mildest of brain injuries, which may cause ... a momentary loss of consciousness," and that loss of consciousness is not necessary to sustain a concussion.
Dr. Misukanis opined, to a reasonable degree of certainty, that Noga suffered concussions while he was playing for the Vikings. He also opined that the evidence of Noga's headaches and occasional nausea was "evidence of post-concussive symptoms," and that when a player experiences those symptoms and continues playing, the player is at an increased risk for brain damage. Dr. Misukanis reasoned that, because Noga's position as a defensive lineman for the Vikings subjected him to "some kind of physical impact on every single play" and Noga "tended to ... lead with his head," Noga was incurring "a lot of ...trauma to the head."
Taking these considerations into account along with Noga's testimony, his review of Noga's records, and his testing and evaluation of Noga, Dr. Misukanis opined that Noga's work activities while playing for the Vikings from 1988 to 1992 were a substantial contributing cause of his dementia. Dr. Misukanis acknowledged that Noga's time spent playing for other football teams was also a substantial factor, as well as Noga's ADHD, sleep apnea, chronic pain, cannabis use, prior methamphetamine use, prior alcohol use, and psychological disturbance. Dr. Misukanis also stated that Noga's difficulty recalling the precise details of his concussions is "typical of people who have dementia, for them to not be great historians."
By contrast, in his supplemental deposition, Dr. Ferneyhough testified that Noga's employment with the Minnesota Vikings was not "a substantial contributing factor" in Noga's diagnosis of major neurocognitive disorder. In explaining his opinion, Dr. Ferneyhough essentially rejected Noga's testimony that he sustained multiple concussions and opined, "[t]here's no evidence at all that [Noga] had any type of head injuries. He told me that he wanted to cover the fact that he was having these multiple concussions so he could continue to play." He opined that, had Noga sustained concussions, others would have noticed that Noga had post-concussive symptoms, and no other testifying witnesses reported observing such symptoms. Dr. Ferneyhough further explained that the "records from the Vikings didn't say [Noga] had symptoms. It didn't say [the Vikings] put [Noga] on restrictions because of problems he was having from any concussions."
Later, however, Dr. Ferneyhough acknowledged that the NFL "had no protocol"
*808 for evaluating and treating head injuries between 1988 and 1992. Dr. Ferneyhough also clarified that he "would assume anyone playing football, particularly on the line, hits their head quite frequently.... He's hitting his head with a football helmet against people. The argument is: did he have a concussion?" Dr. Ferneyhough found it significant that Noga continued to play professional football after leaving the Vikings and maintained his "normal activities and abilities" for some time thereafter as well.
In December 2017, the compensation judge issued his findings and order on remand. The compensation judge adopted the opinion of Dr. Misukanis regarding the "causal relationship between the employee's work activity and his current condition" and his opinion that Noga's work activities for the Vikings "are a substantial contributing factor to the employee's permanent cognitive dysfunction." The compensation judge found that Noga had sustained a Gillette injury consisting of "head trauma, brain injury, and/or dementia" that culminated "on or about December 1, 1992, as a direct result of his work activities with the employer."
Addressing the question of notice, the compensation judge stated, "[i]t is well established that the notice period in Gillette cases starts to run when it has become reasonably apparent to the employee that the work injury has resulted in a compensable disability." The compensation judge agreed with the Vikings that Noga could not give notice before the date of injury and that "it became reasonably apparent to the employee that he was suffering a disabling cognitive disability at least as of Dr. Freuan's [sic] report of February 17, 2004." The compensation judge found that the February 17, 2004, report by Dr. Fruean mentioned, in addition to orthopedic-related incidents, Noga's "blackout and concussion[-]related concerns and the belief that these symptoms were tied to his employment with the [Vikings]." Noting that Dr. Fruean's 2004 report was attached to the stipulation for settlement between the Vikings and Noga on Noga's orthopedic claims, the compensation judge determined that the Vikings "had actual knowledge of [Noga's] condition" and "of the relation to [Noga's] work activities" at least as of the time of that report.
Addressing the statute of limitations, the compensation judge concluded, "[c]ase law is clear that an 'action or proceeding' tolls the statute of limitations. Case law is also clear that inconsequential medical services provided by an employer is not an action or proceeding but consequential medical treatment provided by an employer qualifies and tolls the statute." The compensation judge, relying on Myers v. Minnesota Vikings Football Club, Inc. , 67 Minn. Workers' Comp. Dec. 389 (WCCA 2007), concluded that the care provided by the Vikings' training staff qualified as an action or proceeding. The compensation judge found that Noga "credibly testified that he was given pills, given training room time to rest or sleep it off, and talked to Dr. Fischer and Trainer Fred Zamberletti and was told he would be ok," which the judge concluded "qualifies as medical treatment and was the employer's standard treatment approach for these types of complaints during the time period for which the employee played." Accordingly, the compensation judge concluded that "[t]his is an action or proceeding under the statute and tolls the statute of limitations."
In a 3-2 decision, the WCCA affirmed the compensation judge's decision. Noga v. Minn. Vikings Football Club , No. WC18-6133, 2018 WL 4923827 (Minn. WCCA Sept. 19, 2018). Judge Sundquist, joined by Judge Quinn, wrote separately, concurring on the Gillette - injury determination, but *809 dissenting on the notice and statute-of-limitations issues.
ANALYSIS
This appeal presents three issues. First, the Vikings contend that the WCCA erred by concluding that Noga suffered a Gillette injury in the form of brain injury, head trauma, and/or dementia as a direct result of his work for the Vikings, that his work for the Vikings was a substantial contributing factor in Noga's permanent and total disability, and that the Gillette injury culminated on or about December 1, 1992. Second, the Vikings contend that Dr. Fruean's 2004 report attached to the orthopedic stipulation for settlement did not constitute adequate notice under Minn. Stat. § 176.141. Third, the Vikings argue that the statute of limitations bars Noga's claim because no proceeding occurred that satisfied the statute of limitations under Minn. Stat. § 176.151.
We agree with the Vikings that Noga's claim is barred by the statute of limitations in Minn. Stat. § 176.151. Because our holding on this issue is dispositive, we do not address the arguments regarding the existence or cause of Noga's Gillette injury or the adequacy of the notice that the Vikings received.
The effect of an employer's provision of workers' compensation benefits on the statute of limitations governing an employee's claim is a question of law, which we review de novo. Cf. Roemhildt v. Gresser Cos., Inc. , 729 N.W.2d 289, 292-93 (Minn. 2007). The applicable statute of limitations for Noga's claim is set forth in Minn. Stat. § 176.151. This statute provides that an "[a]ction[ ] or proceeding[ ] ... to determine or recover compensation" must occur within "three years after the employer has made written report of the injury to the commissioner ... but not to exceed six years from the date of the accident." Minn. Stat. § 176.151(a).
As an initial matter, the statute of limitations began to run at the same time that Noga's duty to give notice arose: when Noga had "sufficient information of the nature of the injury or disease, its seriousness, and probable compensability." Jones v. Thermo King , 461 N.W.2d 915, 917 (Minn. 1990) ; see also Issacson v. Minnetonka, Inc. , 411 N.W.2d 865, 867 (Minn. 1987) ; Bloese v. Twin City Etching, Inc. , 316 N.W.2d 568, 571 (Minn. 1982).
Here, neither party contests the compensation judge's implicit determination that the statute of limitations began to run in 2004, when Dr. Fruean's report outlining Noga's various orthopedic and neurological "issues" was attached to the stipulation for the settlement of Noga's claim based on orthopedic injuries. Thus, absent an applicable exception, the statute of limitations on Noga's Gillette claim expired, at the latest, in February 2010.
A.
We turn to the parties' arguments regarding the statute of limitations. Noga contends that an exception to the statute of limitations applies and that a "proceeding" within the meaning of section 176.151(a) occurred that prospectively satisfied the statute of limitations. The Vikings, for their part, argue that no proceeding occurred that tolled or otherwise rendered the statute of limitations inapplicable to Noga's claim.
As we discussed above, Minn. Stat. § 176.151 provides that an "[a]ction[ ] or proceeding [ ] ... to determine or recover compensation" must occur within "three years after the employer has made written report of the injury to the commissioner ... but not to exceed six years from the date of the accident." Minn. Stat. § 176.151(a) (emphasis added). Relying on this language, we have recognized that when an employer assumes responsibility *810 for the benefits that may be due an employee for a work-related injury-such as by paying an employee's work-related hospital or medical bills-that acceptance of responsibility may constitute a proceeding that avoids or tolls the statute of limitations under section 176.151. See, e.g. , Marose v. Maislin Transp. , 413 N.W.2d 507, 512 (Minn. 1987) ; Livgard v. Cornelius Co. , 308 Minn. 467, 243 N.W.2d 309, 310-11 (1976) ; Cowell v. Minnegas Co. , 286 Minn. 535, 176 N.W.2d 84, 85 (1970) ; Knopp v. Gutterman , 258 Minn. 33, 102 N.W.2d 689, 694-96 (1960). More recently, we have said that a proceeding may prospectively satisfy the statute of limitations. See Roemhildt , 729 N.W.2d at 293.[7]
In Livgard , we explained the rationale underlying the principle that an employer's act of assuming responsibility for work-related medical or hospital bills can constitute a proceeding that satisfies the statute of limitations. After reporting a work-related injury to his employer and initially treating the injury at his own expense, the employee was seen by the employer's doctor "for an examination and evaluation," the expenses for which were paid "under the employer's group hospitalization plan." Livgard , 243 N.W.2d at 310. When the employee later filed a claim for workers' compensation benefits, the employer asserted that the claim was barred by the statute of limitations.
We disagreed, explaining that "the furnishing of any kind of benefit required" by the workers' compensation law "indicates an acceptance of liability by the employer and constitutes a 'proceeding' for purposes of [ section] 176.151(1)." Id. at 311 (citing 3 Larson, Workmen's Compensation Law, § 78.43(b)). We explained the "obvious" rationale underlying this rule, namely section "176.151(1) speaks of 'proceedings ... to determine or recover compensation,' " and compensation is defined as " 'all benefits provided by this chapter on account of injury or death.' "[8] Id. (emphasis added); see also Marose , 413 N.W.2d at 512 (explaining that "payment of disability benefits or medical expense by an employer following a compensable injury may constitute an 'action or proceeding' within the meaning" of section 176.151 ); Cowell , 176 N.W.2d at 85 (holding that a proceeding was commenced when the bill for the employee's medical treatment was paid by the employer's insurer).
Relying on this precedent, the WCCA has recognized that when an employer directly provides care for an injury-rather than merely paying for the medical treatment administered by others-a proceeding may exist that satisfies the statute of limitations. See Myers , 67 Minn. Workers' Comp. Dec. at 401-02 (concluding that the employer's treatment of a wrist sprain was "clearly specific to an injury very reasonably proceeding directly" from the employee's work and thus was a "proceeding" for purposes of section 176.151 because the "treatment ... quite reasonably implies an *811 admission of responsibility"). Noga contends that, as in Myers , the care provided by the Vikings' team staff in the form of dispensing Advil or Tylenol-rather than its payment of Noga's medical bills-constitutes a proceeding that satisfies the statute of limitations.
For their part, the Vikings focus primarily on the employer's intent, or, as we said in Livgard , the employer's "conscious sense of obligation." 243 N.W.2d at 311. The Vikings contend that providing Noga with Advil or Tylenol did not rise "to the level of a conscious sense of ... obligation" that Noga had suffered a work-related injury for which it was responsible under the workers' compensation law. In short, the Vikings argue that, without evidence of the requisite intent, no proceeding occurred, and thus, Noga's claim is untimely.
Alternatively, the Vikings contend that the type of care Noga received from its staff did not constitute a proceeding under Minn. Stat. § 176.151, relying on Livgard to argue that the provision of over-the-counter painkillers was not sufficiently meaningful medical treatment. The Vikings also take issue with the timing of the care relative to the onset of Noga's neurological issues. Specifically, the Vikings argue that even if the care provided by staff members to Noga could constitute a proceeding with respect to Noga's individual head injuries, such a proceeding cannot satisfy the statute of limitations with respect to the later-diagnosed Gillette injury (dementia), because the care occurred years before the limitations period had begun to run for the Gillette injury.
B.
We begin with the Vikings' argument that a proceeding did not occur because the Vikings did not intend to assume responsibility for Noga's Gillette injury by providing him with over-the-counter painkillers for headaches and wooziness. As discussed above, an employer's payment of medical bills or expenses may constitute a proceeding that satisfies the statute of limitations under Minn. Stat. § 176.151. See, e.g. , Marose , 413 N.W.2d at 512 ; Cowell , 176 N.W.2d at 85 ; Knopp , 102 N.W.2d at 694-96.
We conclude that the evidence in the record does not support the conclusion that the Vikings assumed liability for Noga's eventual Gillette injury of dementia because nothing suggests that, at the time the Vikings provided care to Noga, the Vikings knew or should have known that Noga would develop such an injury.
Noting that the existence of a proceeding is "assessed on a case by case basis," the compensation judge concluded that the Vikings' team doctor and trainer did, in fact, provide medical treatment to Noga. Specifically, the compensation judge found that Noga credibly testified that he "was given pills, given training room time to rest or sleep it off, and talked to Dr. Fischer and Trainer Fred Zamberletti and was told he would be ok." The compensation judge determined that "this qualifies as medical treatment and was the employer's standard treatment approach for these types of complaints during the time period for which the employee played," noting that "the medical staff is paid by the employer to treat injuries and in the employee's case this is how they chose to do so."
The compensation judge's factual determinations regarding whether the treatment occurred are entitled to deference. But the mere provision of any form of care or assistance to an employee who may be injured is not, by itself, sufficient to establish that a proceeding occurred for the purpose of the statute of limitations under Minn. Stat. § 176.151. Such a conclusion de-couples the employer's actions from the relevant intent that leads to the *812 conclusion that an employer has accepted responsibility for a work-related injury. More succinctly, a proceeding that satisfies the statute of limitations must arise out of the employer's awareness of an obligation for the benefits provided.
At its core, our recognition that the provision of benefits in the form of employer-provided medical treatment can satisfy the statute of limitations preserves a balance between employees and employers. Cf. Minn. Stat. § 176.001 (2018). Absent a point at which the employer's provision of benefits is understood as a proceeding between the employer and employees-in turn, invoking the protections of the workers' compensation law-employees may be lulled into the erroneous assumption that a formal claim for benefits need not be filed. See Weidemann v. Kemper Ins. Grp. , 312 Minn. 157, 251 N.W.2d 117, 119-20 (1977) ("To permit an employer to make unreported payments of the type of benefits compensable under the Workers' Compensation Act and thereafter assert the statute of limitations when the employee files an untimely claim would be subversive of the purposes and objectives of the act."); cf. Savina v. Litton Indus./Litton Med. Sys. , 330 N.W.2d 456, 458 (Minn. 1983) (holding that the employee's claim was not barred by the statute of limitations where the employer made payments to the employee "in lieu of compensation benefits" and noting that the employer "was fully aware of the employee's need for repeated medical treatment and of his eventual inability to continue work, and did nothing to indicate to the employee that it was not accepting his injury as work related " (emphasis added)).
Stated otherwise, an injured worker whose employer initially covers medical expenses or provides medical care for an injury sustained in the course of work activities might conclude that a formal workers' compensation claim is unnecessary. Under these circumstances, the injured worker may believe that the employer's actions demonstrate an acceptance of responsibility for the work-related injury and any ensuing, related, medical expenses. Allowing an employer to pay some initial, perhaps nominal, benefits and then stand by while the limitations clock moves on would create an escape from liability for the very purpose those benefits serve-to relieve the employee from the uncertainty that results from lost wages and medical expenses that can follow work-related injuries. See, e.g. , Franke v. Fabcon, Inc. , 509 N.W.2d 373, 376 (Minn. 1993) ("Workers' compensation ... is social legislation, providing a measure of security to workers injured on the job ...."); Monson v. White Bear Mitsubishi , 663 N.W.2d 534, 538-39 (Minn. 2003) (same); see also Heine v. Simon , 702 N.W.2d 752, 761 (Minn. 2005) ("The purpose of workers' compensation is to provide a measure of security to workers injured on the job."); Weidemann , 251 N.W.2d at 119-20.
But, as this case demonstrates, when a Gillette injury is at issue, the calculus and competing concerns are more complicated. The parties' awareness, at the time of the initial events, of the potential for a Gillette injury and a determination regarding causation may be far more complex, given the nature of the underlying repetitive injuries, the nature of the eventual Gillette injury, and the state of science. In some cases, it may be possible that an employer is aware, or should be aware, that an employee's repetitive stress injuries sustained on the job could lead to a compensable Gillette injury. But where medical knowledge is lacking or undeveloped regarding the link between specific types of on-the-job injuries and potential Gillette injuries, an employer's provision of some measures of comfort is not necessarily an attempt to lull an employee into *813 believing that a workers' compensation claim is unnecessary. In such a case, the usual rationale for recognizing that a proceeding occurs when an employer furnishes benefits under the statute is altogether lacking.
Here, nothing in the record suggests that the Vikings knew or should have known that Noga was at an increased risk of developing a compensable Gillette injury in the form of dementia when the Vikings' staff provided Advil and Tylenol for the headaches and wooziness Noga experienced following play. Noga played for the Vikings from 1988 to 1992, but medical awareness of the connection between and among head injuries, possible concussions, and the potential long-term neurological effects of those events had not yet developed. See, e.g. , Kevin M. Guskiewicz, et al., Epidemiology of Concussion in Collegiate and High School Football Players , 28 Am. J. Sports Med. 643, 644 (2000) (noting in 2000 that guidelines for return to play after concussions "are based on limited scientific data and have been developed based largely on anecdotal clinical evidence," and that as a result "none of the guidelines have been fully accepted or followed with any consistency by the sports medicine community"). Even if we could assume that some sense of obligation can be inferred from the Vikings' provision of care to Noga, that obligation would only be related to Noga's post-play symptoms (headaches), not the Gillette injury (dementia).
In sum, under these facts, we cannot attribute to the Vikings an acceptance of responsibility-or, as we said in Livgard , "a conscious sense of obligation"-for Noga's later-diagnosed dementia when, at most, the care the Vikings staff provided indicated acceptance of responsibility for Noga's headaches and related symptoms. We conclude that, in this case, the Vikings' provision of care for Noga's head injuries did not constitute a proceeding that prospectively satisfied the statute of limitations.[9]
Accordingly, because Noga did not file his claim within the time limit imposed by Minn. Stat. § 176.151, his claim fails.
CONCLUSION
For the foregoing reasons, we reverse the decision of the workers' compensation court of appeals and remand to the compensation judge for dismissal of the claim for benefits.
Reversed.
McKEIG, J., took no part in the consideration or decision of this case.

Noga's formal diagnosis is major neurocognitive disorder, a condition formerly known as dementia. Because dementia is the term commonly used by laypeople, we generally refer to Noga's diagnosis as dementia for ease of reading.

As we explained in Ryan v. Potlatch Corp. , 882 N.W.2d 220, 222 n.1 (Minn. 2016), "[a] Gillette injury occurs when the cumulative effects of minute, repetitive trauma are serious enough to disable an employee." See also Marose v. Maislin Transp. , 413 N.W.2d 507, 510 (Minn. 1987) (explaining that a Gillette injury is "a personal injury arising out of and in the course of employment as a result of the cumulative effect of repetitive minute trauma over a period of time"); Gillette v. Harold, Inc. , 257 Minn. 313, 101 N.W.2d 200, 206 (1960).

The compensation judge determined that Noga learned of his Gillette injury and the Vikings had notice of Noga's Gillette injury by virtue of the same medical report, which was attached to a 2004 Stipulation for Settlement of an unrelated workers' compensation claim that Noga filed against the Vikings. That claim related to orthopedic injuries Noga sustained while playing for the Vikings.

Regarding his career with the Vikings, Noga testified that he played 9 games in 1988, 16 games in 1990, 16 games in 1991, and 16 games in 1992, for a total of 57 games. Noga testified that he could not remember whether he played all 16 games in 1989, but an excerpt from The ESPN Pro Football Encyclopedia (2d ed. 2007), which is in the record, indicates that Noga played in all 16 games for the Vikings in 1989. The record thus reflects that Noga played in a total of 73 games for the Vikings, notwithstanding Noga's difficulty recalling the 1989 season.

In December 2013, with Dr. Spina's help, Noga applied for NFL 88 plan benefits. The "88 Plan Application for Dementia Benefits" states: "The 88 Plan was established to pay and reimburse qualifying expenses incurred by or on behalf of eligible NFL Players who have dementia." On January 27, 2014, the NFL approved Noga's application for benefits, which includes the costs of Noga's medical and custodial care.

The accident to which Dr. Ferneyhough referred occurred on February 10, 2011, and involved Noga being hit by a car at 5 miles per hour after which Noga reported wrist and shoulder pain. There was no indication of any head injury as a result of the accident.

The parties disagree regarding the procedural effect of a proceeding on the statute of limitations. The Vikings argue that even if the treatment provided by the Vikings staff can be deemed a proceeding, Noga's claim is still time-barred because a proceeding cannot toll the statute of limitations if the provision of medical care occurs before the limitations period has started to run. Noga, on the other hand, argues that a proceeding does not toll, but rather "satisfies" and "avoids" the statute of limitations altogether, asserting that "the occurrence of a 'proceeding' through provision of medical treatment does not 'toll' the statute-it satisfies it prospectively , thereby rendering it inapplicable." Although we use the language of Roemhildt , whether a proceeding satisfies or tolls the statute of limitations is not essential to our resolution of this appeal.

The current version of the "compensation" definition is codified at Minn. Stat. § 176.011, subd. 6a (2018).

In Livgard , we considered whether the employer's act of providing an employee with an over-the-counter painkiller constituted a proceeding that satisfied the statute of limitations under Minn. Stat. § 176.151. See 243 N.W.2d at 310-11. We said that "[a]spirin is undoubtedly dispensed every day by Minnesota employers," and is often used to relieve "minor ailments ranging from toothaches to headaches," not necessarily "as a form of compensation" for an injured employee. Id. at 311. Ultimately, we resolved Livgard on alternate grounds, based on the employer's payment of the employee's medical bill. Id. at 310-11. In this case, we do not need to resolve whether the act of providing over-the-counter painkillers can constitute a proceeding that satisfies the statute of limitations.